IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:20-cv-75

RED WOLF COALITION,                )
DEFENDERS OF WILDLIFE, and         )
ANIMAL WELFARE INSTITUTE,          )
                                   )
          Plaintiffs,              )
                                   )
v.                                 )
                                   )
THE UNITED STATES FISH AND         )
WILDLIFE SERVICE; AURELIA          )
SKIPWITH, in her official capacity as Director   )
of the United States Fish and Wildlife Service;  )          **COMPLAINT**
LEOPOLDO MIRANDA, in his official  )
capacity as Regional Director of the United   )          [Fed. R. Civ. P. 7]
States Fish and Wildlife Service Southeast   )
Region,                            )
                                   )
          Defendants.              )
_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This case challenges the actions of the United States Fish and Wildlife Service

("USFWS" or "Service"), Aurelia Skipwith, in her official capacity as Director of the USFWS,

and Leopoldo Miranda, in his official capacity as Regional Director of the USFWS for the

Southeast Region (collectively, "Defendants"), that will imminently cause the extinction of the

world's only wild population of red wolves in violation of the Endangered Species Act ("ESA"),

16 U.S.C. §§ 1531 et seq., if not promptly remedied.

2.     Despite decades of successfully managing and growing the red wolf population in

eastern North Carolina through regular releases of captive red wolves into the wild, the Service

1

has now bound itself to a policy prohibiting the use of this known successful conservation measure. As a result of this policy and the Service's refusal to reinstate other long-standing conservation actions, only seven red wolves are known to remain in the wild today.

3.     In 2018, this Court found the Service to be in violation of the ESA's commands to insure that its actions are not likely to jeopardize the continued existence of the endangered red wolf, 16 U.S.C. § 1536(a)(2), and provide for the conservation and recovery of the endangered red wolf, *id.* § 1536(a)(1), because of the Service's mismanagement of the species. *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 807 (E.D.N.C. 2018). Defendants did not remedy these violations in response to the Court's order.

4.     Since this Court's 2018 ruling, Defendants have committed additional violations of the ESA—increasing the likelihood of extinction and the barriers to red wolf recovery—by barring the release of captive red wolves and claiming that they lack the authority to proactively manage coyotes in the Red Wolf Recovery Area. These actions—in the face of a population that continues to plummet toward extinction—*also* violate the Service's duties to insure against jeopardy, 16 U.S.C. § 1536(a)(2), and provide for the conservation of the species, *id.* § 1536(a)(1). Furthermore, Defendants' decision to reverse decades of agency action and bind itself to a new policy prohibiting releases is arbitrary, capricious, an abuse of discretion, and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06.

5.     Plaintiffs Red Wolf Coalition, Defenders of Wildlife, and Animal Welfare Institute (collectively, "Conservation Groups") seek declaratory and injunctive relief to address these ongoing violations of federal law.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question);

28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); 16 U.S.C. §§ 1540(c)

and (g) (ESA district court jurisdiction and citizen suit jurisdiction); and 5 U.S.C. §§ 701–06

(Administrative Procedure Act).

7.     Pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), Conservation

Groups furnished the U.S. Secretary of the Interior, USFWS Director, and USFWS Regional

Director for the Southeast Region with written notice of their intent to bring suit for the

violations of law alleged in this Complaint on September 14, 2020, more than sixty (60) days

ago. The notice of intent to sue is attached as Exhibit 1.

8.     Defendants responded to Conservation Groups' September 14, 2020 Notice of

Intent to Sue with a letter signed dated September 30, 2020, but in that letter described no actions

that would remedy the violations of law that Conservation Groups identified.

9.     Venue is proper in this district pursuant to 16 U.S.C. § 1540(g)(3)(A), because the

violations of the ESA are occurring in this district, and pursuant to 28 U.S.C. § 1391(b)(2),

because a substantial part of the events giving rise to the claims occurred in this district.

10.     Venue is proper in this division because Plaintiff Red Wolf Coalition has its

principal office in Tyrell County in the division.  Local Civil Rule 40.1(c)(1).

## PARTIES

11.     Plaintiff Red Wolf Coalition ("RWC") is a non-profit organization founded in

1997 and located in Columbia, North Carolina, within the Red Wolf Recovery Area.  RWC has

approximately 40,000 members and supporters, including 1,000 members and supporters who

reside in North Carolina.  RWC advocates for the long-term survival of the wild red wolf

population by teaching about the red wolf and by fostering public involvement in red wolf conservation. Through a variety of programs, RWC provides its members, supporters, and the public with science-based information about the biology and ecology of the endangered red wolf and its value to the eastern North Carolina ecosystem. RWC works with the USFWS Red Wolf Recovery Program on red wolf restoration and management issues in an effort to establish and maintain healthy populations of wild red wolves. RWC also works with other organizations to focus world-wide attention on the effort to ensure the long-term survival of wild red wolf populations.

12.     Plaintiff Defenders of Wildlife ("Defenders") is a national non-profit, public interest organization founded in 1947. Defenders has more than 1.5 million members and supporters nationwide, including nearly 31,000 members and supporters in North Carolina. Defenders is dedicated to the protection of all endangered or threatened wild animals and plants in their natural communities, and the preservation of the habitat on which they depend. Defenders advocates new approaches to wildlife conservation that will help prevent species from becoming endangered, using education, litigation, research, legislation, and advocacy to defend wildlife and their habitats. Defenders has actively supported the red wolf reintroduction to the Alligator River National Wildlife Refuge since the first eight wolves were released here in 1987.

13.     Plaintiff Animal Welfare Institute ("AWI") is a national non-profit, public interest organization founded in 1951. It has more than 217,000 members and constituents worldwide, including more than 6,200 members and constituents in North Carolina. AWI is dedicated to alleviating the suffering caused to animals by people and to protecting species threatened with extinction. AWI's activities focus on minimizing impacts of human actions detrimental to endangered or threatened species, including harassment, habitat degradation, encroachment and

destruction, and irresponsible hunting and trapping practices. Through advocacy, litigation, legislation, research, and education, AWI acts to safeguard endangered or threatened wild animals and their habitats and to implement humane solutions to human-wildlife conflicts. AWI works with national, state, and local governments and other policymakers to protect animals, often by preventing actions damaging to species and by promoting effective and safe wildlife protection laws and regulations. AWI helped win passage of the federal ESA, and continues to work with members of Congress to secure funding for the Service to enforce the ESA.

14. Since 2012, Plaintiff Conservation Groups and their members have consistently expressed their ongoing concerns about the management of North Carolina's red wolf population and sought to address the leading threats to this, the world's only wild population of this species. In 2014, this Court awarded Conservation Groups an injunction against the State of North Carolina's authorization of coyote hunting in the Red Wolf Recovery Area in order to protect endangered red wolves from illegal take caused by gunshot. *See Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*, No. 2:13-CV-60-BO, 2014 WL 1922234, at * 10-11 (E.D. N.C. May 13, 2014). Conservation Groups and the State of North Carolina ultimately agreed to settle this case for the prohibition of nighttime coyote hunting and a permitting system for daytime coyote hunting in the Red Wolf Recovery Area.

15. In 2016, this Court awarded Conservation Groups an injunction against the U.S. Fish and Wildlife Service's authorization of permits for landowners to capture and kill non-problem red wolves in the Red Wolf Recovery Area. *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 807 (E.D.N.C. 2016). In 2018, this Court made that injunction permanent and further declared that the Service was violating the ESA through its actions and

inactions that were undermining the conservation of wild red wolves in North Carolina. *See Red Wolf Coal.*, 346 F. Supp. 3d at 813.

16. Through letters, meetings, and other advocacy, Conservation Groups and their members and supporters have repeatedly urged the Service to use its authorities in furtherance of the conservation and recovery of the red wolf in the wild.

17. Conservation Groups bring this action on behalf of their members and supporters who live and work in the vicinity of the Red Wolf Recovery Area, as well as members and supporters from across North Carolina and the United States who visit, observe, photograph, and otherwise enjoy red wolves in the wild. These members and supporters derive scientific, aesthetic, educational, professional, and recreational benefits from the presence of red wolves in eastern North Carolina and are harmed by Defendants' actions which have caused and will continue to cause the demise of the wild red wolf population.

18. This harm will be redressed by an order from this Court declaring that Defendants are violating the ESA by failing to ensure that their policy barring the release of captive red wolves into the wild is not likely to jeopardize the continued existence of the red wolf; declaring that Defendants are violating the ESA by failing to provide for the conservation of the red wolf; and declaring that Defendants have acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, 5 U.S.C. §§ 553, 706, by binding itself to a policy prohibiting the release of captive red wolves into the Red Wolf Recovery Area; setting aside and holding unlawful this policy; and requiring Defendants to immediately reinstate their previously successful conservation measures, including the release of captive red wolves and the adaptive management of coyotes to prevent hybridization.

6

19.     Defendant USFWS is a federal agency located within the United States Department of the Interior.  The Service is responsible for administering the ESA's provisions for all terrestrial wildlife and freshwater fish.

20.     Defendant Aurelia Skipwith is named in her official capacity as Director of the United States Fish and Wildlife Service.  As such, she is charged with administering the ESA as it applies to terrestrial animals, including the red wolf.

21.     Defendant Leopoldo Miranda is named in his official capacity as Regional Director of the United States Fish and Wildlife Service Southeast Region.  The Southeast Region includes North Carolina and the Red Wolf Recovery Area.  As such, he is responsible for administering the ESA with respect to the wild red wolf population in North Carolina.

## LEGAL BACKGROUND

### ESA Protections for the Endangered Red Wolf

22.     The purpose of the ESA is to conserve endangered and threatened species and the ecosystems upon which they depend.  16 U.S.C. § 1531(b).  The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary."  *Id.* § 1532(3).  Accordingly, the goal of the ESA is not just to save endangered and threatened species from extinction, but to recover these species to the point where they no longer need the protections of the statute.

23.     Section 10(j) of the ESA furthers the ESA's conservation mandate by providing for the reintroduction of threatened or endangered species into portions of their historic ranges. 16 U.S.C. § 1539(j)(2)(A); 50 C.F.R. § 17.81(a).

24.     When these reintroduced populations are geographically separated from extant populations of the species, they are called "experimental populations."  16 U.S.C. § 1539(j)(1).

25.      For each experimental population released pursuant to Section 10(j), the Service must by regulation identify the population and determine, on the basis of the best available information, whether that population is "essential to the continued existence" of the species in the wild.  16 U.S.C. § 1539(j); 50 C.F.R. § 17.81(c)(2).

26.     Each member of an experimental population is "treated as a threatened species," except that critical habitat may not be designated for "nonessential" experimental populations, and the typical ESA Section 7 consultation requirements apply to a "nonessential" population only when the population "occurs in an area within the National Wildlife Refuge System or the National Park System."  16 U.S.C. § 1539(j)(2)(C).

27.     Despite the greater flexibility imparted by a Section 10(j) rule, experimental populations must be managed to further the conservation of the species.  *See* 16 U.S.C. §§ 1533(d); 1539(j)(2)(A); 50 C.F.R. § 17.81(b).

28.     The Service first promulgated a 10(j) rule for the red wolf ("red wolf rule") in 1986.  *See* Determination of Experimental Population Status for an Introduced Population of Red Wolves in North Carolina, 51 Fed. Reg. 41,790 (Nov. 19, 1986).  The red wolf rule authorized reintroduction of red wolves into the Alligator River National Wildlife Refuge in Dare County, North Carolina, as an experimental population.  *Id.*

29.     The range of the reintroduced red wolf population is defined to include all of Dare County and the adjacent Tyrrell, Hyde, Washington, and Beaufort Counties.  *See* 50 C.F.R. § 17.84(c)(9)(i).  This area is commonly referred to as the Red Wolf Recovery Area.

30.     The Service issued the red wolf rule at 50 C.F.R. § 17.84(c) for the conservation of the species and the success of the wild red wolf population.  *See* 51 Fed. Reg. at 41,797 (final rule for red wolf reintroduction); *see also Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (upholding the red wolf rule as "part of the overall federal scheme to protect, preserve, and rehabilitate endangered species, thereby conserving valuable wildlife resources important to the welfare of our country.").

31.     The text of the red wolf rule published at 50 C.F.R. § 17.84 does not include and has never included a limit on the number of red wolves that may be released.

## ESA Section 7 Requirements for Federal Agencies

32.      Section 7(a)(2) of the ESA requires that federal agencies "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2).

33.     Section 7(a)(2) imposes two obligations on federal agencies, the first being "procedural and requir[ing] that agencies consult with the FWS to determine the effects of their actions on endangered or threatened species and their critical habitat" and the second being "substantive and requir[ing] that agencies insure that their actions not jeopardize endangered or threatened species or their critical habitat."  *See Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008).

34.     Section 7(a)(1) of the ESA directs federal agencies to "utilize their authorities in furtherance of the purposes" of the ESA "by carrying out programs for the conservation" of species protected under the ESA.  16 U.S.C. § 1536(a)(1).

35.     Section 7(a)(1) further requires that the Secretary of the Interior, or USFWS as the delegated agency administering the ESA, review programs administered by USFWS and "utilize such programs in furtherance of the purposes of this chapter."  *Id.*

### Administrative Procedure Act

36.     The APA, 5 U.S.C. §§ 551 *et seq.*, governs the procedural requirements for federal agency decisionmaking.  The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

37.     The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of the procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

38.     An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

39.     Additionally, "[a]gencies are free to change their existing policies," but they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

40.     The Service's new policy prohibiting the release of captive red wolves into the Red Wolf Recovery Area is a final agency action within the meaning of the APA and

accordingly is judicially reviewable under § 704 of the APA. *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1020–23 (D.C.Cir.2000).

## FACTUAL BACKGROUND

### Red Wolves in Eastern North Carolina

41.     Only seven known red wolves (*Canis rufus*) remain in the wild in North Carolina today.

42.     The North Carolina red wolves constitute the only wild population of red wolves in the world.

43.     The red wolf is one of the most endangered species in the world.

44.     The red wolf was first designated as an endangered species in 1967 under the Endangered Species Preservation Act of 1966, the precursor to the federal ESA, 16 U.S.C. §§ 1531 *et seq. See* 32 Fed. Reg. 4,001 (Mar. 11, 1967) (listing the red wolf as an endangered species).

45.     By 1975, the Service determined that the only way to save the red wolf from extinction was to remove all red wolves from the wild and institute a captive-breeding program. More than 400 canids were captured by the Service, but only 17 were identified as pure red wolves. Fourteen of these wolves became the founding members of the captive-breeding program and the ancestors of all known red wolves living today.

46.     The 1986 rule providing for the reintroduction of red wolves specified that the status of the eastern North Carolina population would be reevaluated within 5 years to determine future management status and needs, and that this review would take into account the reproductive success of the mated pairs, movement patterns of individual animals, food habits, and the overall health of the population. *See* 51 Fed. Reg. at 41,797.

47.     In 1987, four pairs of red wolves bred in captivity were released into the Alligator River National Wildlife Refuge in eastern North Carolina as an experimental population under Section 10(j) of the ESA, 16 U.S.C. § 1539(j).

48.     According to the Red Wolf Recovery/Species Survival Plan, finalized in 1990, the Service's ultimate goal is to grow the wild population to approximately 220 wolves.

49.     The Red Wolf Recovery/Species Survival Plan also set as an objective providing at least 12 animals every other year for reintroduction purposes for the first five years of the program.

50.     The eastern North Carolina population is the only successful reintroduction of red wolves that has been achieved.

51.     In 1991, the Service amended the red wolf rule to expand the designated range of the experimental population to additionally include Beaufort County, along with previously-designated Dare, Tyrrell, Hyde, and Washington Counties. Determination of Experimental Status for an Introduced Population of Red Wolves in North Carolina and Tennessee, 56 Fed. Reg. 56,325, 56,326, 56,334 (Nov. 4, 1991).

52.     During the first five years of the red wolf reintroduction project, from September 14, 1987 through September 30, 1992, 42 wolves (19 adults, 1 yearling, 22 pups) were initially released into the Red Wolf Recovery Area on 15 occasions.  Four releases were conducted in 1987, two in 1988, five in 1989, two in 1990, one in 1991, and one in 1992.  *See* Revision of the Special Rule for Nonessential Experimental Populations of Red Wolves in North Carolina and Tennessee, 60 Fed. Reg. 18,940, 18,940 (Apr. 13, 1995).

53.     After consideration of the results from the initial 5-year experimental reintroduction over the course of 1987-1992, as well as public input, the Service determined that

it would continue to manage the present population at Alligator River National Wildlife Refuge and expand the population with additional releases in the Red Wolf Recovery Area. *See* 60 Fed. Reg. at 18,941.

54.    In 1993, as the red wolf population grew, the Service began additionally releasing wolves at Pocosin Lakes National Wildlife Refuge. This provided the Service with more opportunities to release additional wolves and allowed wolves to disperse to more available habitat from their site of introduction. The Service determined that no change to the red wolf rule was required since the reintroductions at Pocosin Lakes were within the counties previously designated for the experimental population. *See* 60 Fed. Reg. at 18,941.

55.    The Red Wolf Recovery Area currently encompasses about 1.7 million acres, including four national wildlife refuges—Alligator River National Wildlife Refuge, Pocosin Lakes National Wildlife Refuge, Mattamuskeet National Wildlife Refuge, and Swanquarter National Wildlife Refuge—the United States Air Force's Dare County Bombing Range, state-owned lands, and private lands.

56.    Red wolves were released into the Red Wolf Recovery Area every year from the first reintroductions in 1987 until the most recent release of a red wolf from the captive population in 2014.

57.    Starting in 2002, this included the regular release of captive-born red wolf puppies less than two weeks old into wild red wolf litters in a process called "pup fostering." USFWS's Quarterly Reporters for the Red Wolf Program document that at least two captive-born pups were released into the wild in 2002, four in 2006, three in 2007, four in 2009, two in 2010, two in 2011, two in 2012, one in 2013, and two in 2014.

58.     From September 1987 through April 2014, a total of 134 red wolves were released into the five-county Red Wolf Recovery Area, including 42 adults, 22 juveniles, and 70 pups. Ninety of these were captive-born red wolves, forty were born on island propagation sites, and four were transferred from the Great Smokey Mountains National Park reintroduction site. Red wolves were released as mated breeding pairs, sibling groups, family groups, or foster pups.

59.     Hybridization with coyotes was recognized by the Service in 1999 as the leading threat to the wild red wolf population.  The Service accordingly developed its Red Wolf Adaptive Management Work Plan and began sterilizing coyotes in the Red Wolf Recovery Area in 2000.

60.     The Service's Red Wolf Adaptive Management Work Plan provided for the sterilization of hormonally intact coyotes and hybrids via vasectomy and tubal ligation, and then used them as territorial "place-holders" until replaced by wild red wolves. "Placeholder" canids do not interbreed with wild red wolves, and they exclude other coyotes or hybrids from the territory they hold. Ultimately, the "placeholder" canids would be replaced by red wolves either naturally (e.g., displacement) or via management actions (e.g., removal followed by pairing wild or translocated wolves into the territory).

61.     The goals of this plan were to "(1) reduce interbreeding between red wolves and coyotes to a level that does not threaten the long term genetic integrity of the red wolf in the wild while simultaneously (2) building and maintaining the wild red wolf population from the east to west of the NENC recovery area." *See* 2005 Red Wolf Adaptive Management Work Plan.

62.     Adaptive management, which included both sterilizing coyotes and removing red wolf-coyote hybrids to protect the red wolf gene pool, was implemented as an integral part of the red wolf recovery program.

63.     The Service utilized a management-zone approach to implement coyote sterilizations and removals and adaptively manage coyote-wolf interactions under the Red Wolf Adaptive Management Work Plan.  For fifteen years, the Service's implementation of the Red Wolf Adaptive Management Work Plan effectively addressed the threat of hybridization by preventing genetic introgression.

64.     By reducing the rate of hybridization, sterilization activities were successful at limiting hybrid litters to only a few each year.  Accordingly, the genetic composition of the red wolf population in 2014 contained less than 4% coyote introgression.

65.     As a result of the coordinated, science-based work of the Service and other entities, the population of wild red wolves successfully grew to 100 individuals in the late 1990s.

66.     In the 2007 Red Wolf 5-year Status Review, the Service determined the reintroduction of red wolves to the Red Wolf Recovery Area to be a "remarkable success," with nearly 130 red wolves in the wild.

67.     The population was able to maintain these numbers for more than a decade.  From 2002-2014 the population was always estimated at 100 or more individuals, peaking at an estimated 130 wolves in the late 2000s.

68.     In June 2015 the Service revised its population estimate downward to between 50 and 75 wolves.

69.     In March 2016, the Service again adjusted its population estimate downward to between 45 and 60 wolves.

### USFWS's Suspension of Recovery Efforts

70.     On June 30, 2015, the Service announced that it was suspending its release of red wolves from captivity into the Red Wolf Recovery Area while it reviews the continued viability

of the red wolf recovery program. In that announcement, the Service stated that it intended to complete its review of the program by the end of 2015. On the same day, the Service also announced that it would temporarily discontinue adaptive management of coyotes in the Red Wolf Recovery Area.

71.     The Service also prepared a Biological Opinion for the red wolf program in 2015, in which the Service found that, when the Service restarted releases following the temporary suspension for the program review, the consistent release of 2-4 red wolves from the captive population per year would not be likely to jeopardize the continued existence of the species.

72.     On November 12, 2015, Conservation Groups filed suit against Defendants for their actions and inactions that were violating the Endangered Species Act and National Environmental Policy Act and undermining the conservation of wild red wolves in North Carolina.

73.     On September 29, 2016, this Court enjoined Defendants from "taking red wolves, either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84(c)(4)(v) and (c)(10) without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets." *Red Wolf Coal.*, 210 F. Supp. 3d at 807.

74.     The Court made its September 2016 injunction permanent in November 2018, when the Court also ruled that the USFWS decisions to discontinue successful red wolf conservation tools while authorizing the removal and private landowner lethal takes of non-problem red wolves, amounted to a failure to comply with its affirmative duty to "carry out conservation measures until conservation [is] no longer necessary." *Red Wolf Coal.*, 346 F. Supp. 3d at 814.

75.     As Defendants acknowledged in that previous litigation, the USFWS-commissioned 2016 Population Viability Analysis found that the maintenance of "[c]urrent conditions, without releases from the [captive] SSP [population] or improvements to [wild population] vital rates, will result in extinction of the only remaining wild population of red wolves in as soon as 8 years."

76.     Since November 2018, however, the Service has neither released captive red wolves into the Red Wolf Recovery Area nor resumed implementation of its Red Wolf Adaptive Management Work Plan.

**USFWS's New Policy Prohibiting Red Wolf Releases**

77.     In June 2018, during the pendency of the prior litigation, the Service published a proposed revision to the red wolf rule.  *See* Proposed Replacement of the Regulations for the Nonessential Experimental Population of Red Wolves in Northeastern North Carolina, 83 Fed. Reg. 30,382 (June 28, 2018).  In the preamble of this rule, the Service stated that the currently applicable 1995 red wolf rule did not permit additional releases of red wolves beyond the first 12 wolves that had been released in 1987.

78.     The Service did not cite to any language in the 1995 rule, or any other source, as the basis for this assertion.

79.     The Service also did not acknowledge the previous 134 wolves that had been released in the Red Wolf Recovery Area since 1987.

80.     The preamble of the proposed rule also stated the current red wolf rule "lack[s] the needed flexibility to adapt to the arrival and proliferation of coyotes in eastern North Carolina.  For example, the current regulations do not explicitly incorporate Red Wolf Adaptive Management Work Plan (RWAMWP) activities . . . ."  83 Fed. Reg. at 30, 384.

81. Since June 2018, the Service has repeatedly asserted in both agency decision memoranda and public statements that it is not permitted to release captive red wolves into the Red Wolf Recovery Area.

82. In the winter of 2019-2020, the agency transferred one red wolf from St. Vincent National Wildlife Refuge in Florida to the North Carolina wild population. Because this was a transfer from the island propagation site, the Service did not consider it to be a release from the captive population.

83. In internal communications preceding the transfer effort, USFWS officials repeatedly stated that they were not permitted to release any wolves from the captive population into the wild.

### The Current Crisis

84. There are now only seven known red wolves in the wild.

85. These wolves primarily inhabit Alligator River National Wildlife Refuge and Pocosin Lakes National Wildlife Refuge.

86. No wild litters of red wolves were born in North Carolina in either 2019 or 2020.

87. This is the first time that no red wolf litters have been born in the wild since 1998.

88. No red wolves have been released from captivity into the Red Wolf Recovery Area since 2014.

89. Only eight coyotes have been sterilized in the Red Wolf Recovery Area since 2018, all during February 2020.

90. By contrast, 75 coyotes were sterilized across the Red Wolf Recovery Area between January 2012–March 2014, when the Service was implementing its Red Wolf Adaptive Management Work Plan.

91.     In its Draft Environmental Assessment released with the June 2018 Proposed Rule, the Service stated that implementation of the Red Wolf Adaptive Management Work Plan is necessary to effectively establish and maintain a red wolf population.

92.     The Draft Environmental Assessment concluded that without implementation of the Red Wolf Adaptive Management Work Plan or additional red wolf releases into the population, current management would be expected to lead to the extirpation of red wolves from the North Carolina wild population.

93.     The Service has announced no changes or progress on revising the red wolf rule since its November 2018 public notice that it was extending its review of the June 2018 Proposed Rule in response to the Court's ruling.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

**Defendants Violated Section 7(a)(2) of the ESA by Failing to Ensure That Its Actions Are Not Likely to Jeopardize the Continued Existence of the Red Wolf**

94.     The Conservation Groups incorporate by reference the allegations of paragraphs 1–93 as if set forth in full.

95.     Section 7(a)(2) of the ESA requires the Service to "insure that any action authorized, funded, or carried out by [USFWS] . . . is not likely to jeopardize the continued existence of" a threatened species.  16 U.S.C. § 1536(a)(2).

96.     Section 10(j) experimental populations are treated as threatened species for purposes of Section 7 when such population "occurs in an area within the National Wildlife Refuge System."  16 U.S.C. § 1539(j)(2)(C).

Case 2:20-cv-00075-BO   Document 1   Filed 11/16/20   Page 19 of 23

97.     Current Service policy prohibits the agency from releasing captive red wolves into the Red Wolf Recovery Area.  The Service has not released any red wolves from the captive population since adopting this policy.

98.     The Service has sterilized only eight coyotes in the entire Red Wolf Recovery Area since November 2018.

99.      The Service's 2018 Draft Environmental Analysis concluded that without implementation of the Red Wolf Adaptive Management Work Plan or additional red wolf releases into the population, current management would be expected to lead to the extirpation of red wolves from the North Carolina wild population.

100.    Defendants have failed to meet their substantive duty to ensure that the Service's current management of the wild red wolf population, including its policy of prohibiting releases from the captive population and its termination of the Adaptive Management Work Plan, is not likely to jeopardize the continued existence of the significantly declined red wolf population in violation of Section 7 of the ESA, 16 U.S.C. § 1536(a)(2).

**SECOND CLAIM FOR RELIEF:**

**Defendants Violated Section 7(a)(1) of the ESA by Failing to Carry Out a Program for the Conservation of the Red Wolf**

101.    The Conservation Groups incorporate by reference the allegations of paragraphs 1–100 as if set forth in full.

102.    Section 7(a)(1) of the ESA requires the Service to administer the red wolf program "in furtherance of the purposes" of the ESA, "by carrying out programs for the conservation" of listed species. 16 U.S.C. § 1536(a)(1).

103.    The Service's policy prohibiting the release of captive red wolves has removed an essential and long-standing conservation measure for red wolves.  The Service's refusal to

resume adaptive management to prevent hybridization with coyotes has removed an essential and long-standing conservation measure for red wolves. The Service has not replaced these proven conservation measures with any comparable program to conserve the species, in violation of Section 7(a)(1) of the ESA.

104.     Defendants have violated and will continue to violate Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), through its current management of the Red Wolf Recovery Program.

105.     In the alternative, Defendants have violated and will continue to violate Section 7(a)(1) of the ESA by managing the four wildlife refuges in the Red Wolf Recovery Area in direct contravention of the ESA Section 7(a)(1)'s requirement to administer them in furtherance of the conservation purposes of the ESA.

## THIRD CLAIM FOR RELIEF:

## Defendants Violated the APA by Irrationally and Without Explanation Reversing its Policy on the Release of Captive Red Wolves Into the Red Wolf Recovery Area

106.     The Conservation Groups incorporate by reference the allegations of paragraphs 1–105 as if set forth in full.

107.     Under the APA, 5 U.S.C. §§ 551 *et seq.*, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of the procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

108.     An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

109.    The Service has failed to provide a reasoned analysis for its change in position from reintroducing over 100 red wolves into the Red Wolf Recovery Area since 1987 to now prohibiting the release of captive red wolves under the same red wolf 10(j) rule that has been in place for the last 25 years.

110.    Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and failed to follow the procedures required by law, in violation of the APA.  5 U.S.C. §§ 553, 706.  Consequently, the Service's prohibition on the release of captive red wolves into the Red Wolf Recovery Area should be held unlawful and set aside.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Issue a declaratory judgment that:

1.   Defendants have violated Section 7(a)(2) of the ESA by failing to ensure that the Service's policy of prohibiting red wolf releases from captivity into the Red Wolf Recovery Area and refusal to resume adaptive management is not likely to jeopardize the continued existence of the red wolf;

2.   Defendants have violated Section 7(a)(1) of the ESA by failing to carry out a program to conserve the endangered red wolf, pursuant to 16 U.S.C. § 1536(a)(1); and

3.   Defendants have acted in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and failed to follow the procedures

required by law, under the APA, 5 U.S.C. §§ 553, 706, in binding itself to a policy that prohibits the release of captive red wolves into the Red Wolf Recovery Area;

B. Issue an injunction requiring Defendants to immediately withdraw their interpretative policy prohibiting the release of captive red wolves and reinstate the release of captive red wolves into the Red Wolf Recovery Area and resume adaptive management to limit and prevent hybridization with coyotes;

C. Award Plaintiffs the costs of this action, including their reasonable attorneys' fees; and

D. Grant Plaintiffs such additional relief as the Court deems just and proper.

This the 16th day of November 2020.

Respectfully submitted,

/s/ Ramona H. McGee
Ramona H. McGee
N.C. State Bar No. 47935
rmcgee@selcnc.org
Sierra B. Weaver
N.C. State Bar No. 28340
sweaver@selcnc.org
Derb S. Carter, Jr.
N.C. State Bar No. 10644
dcarter@selcnc.org

SOUTHERN ENVIRONMENTAL LAW CENTER
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Attorneys for Plaintiffs