IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:20-cv-00075

| | |
|---|---|
| RED WOLF COALITION,<br>DEFENDERS OF WILDLIFE, and<br>ANIMAL WELFARE INSTITUTE,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>THE UNITED STATES FISH AND<br>WILDLIFE SERVICE; AURELIA<br>SKIPWITH, in her official capacity as Director<br>of the United States Fish and Wildlife Service;<br>LEOPOLDO MIRANDA, in his official<br>capacity as Regional Director of the United<br>States Fish and Wildlife Service Southeast<br>Region,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION**

**FOR PRELIMINARY INJUNCTION**

[Fed. R. Civ. P. 65]

# TABLE OF CONTENTS

STATEMENT OF THE CASE .................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 3

STANDARD OF REVIEW .................................................................................................... 9

ARGUMENT .................................................................................................... 10

   I.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims. .................................... 12

      A.   The Service Is Violating the Endangered Species Act's Requirements to Ensure That Its Actions Are Not Likely to Jeopardize the Continued Existence of the Red Wolf .......... 13

      B.   The Service Is Violating the Endangered Species Act's Requirements to Carry Out Programs for the Conservation and Recovery of the Red Wolf. .......................................... 15

      C.   The Service's Policy Prohibiting the Release of Captive Red Wolves Into the Red Wolf Recovery Area Violates the Administrative Procedure Act. ...................................... 18

   II.   Plaintiffs Are Likely to Suffer Irreparable Harm If an Injunction Is Not Granted. ...... 22

   III.   The Balance of Harms and the Public Interest Justify Granting Injunctive Relief. ...... 25

   IV.   The Court Should Grant Relief Based on USFWS's Own Actions and Studies .......... 27

CONCLUSION .................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                 **Page(s)**

*All. for the Wild Rockies v. U.S. Dep't of Agric.*,
772 F.3d 592 (9th Cir. 2014) ................................................................................14

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) ......................................................................10

*Amoco Prod. Co. v. Gambell*,
480 U.S. 531 (1987)..........................................................................................22, 24

*Carson-Truckee Water Conservancy Dist. v. Clark*,
741 F.2d 257 (9th Cir. 1984) ................................................................................16

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ..............................................................................13

*De Beers Consol. Mines, Ltd. v. United States*,
325 U.S. 212 (1945)...............................................................................................27

*Defs. of Wildlife v. Martin*,
454 F. Supp. 2d 1085 (E.D. Wash. 2006) .............................................................13

*Defs. of Wildlife v. Norton*,
239 F.Supp. 2d 9 (D.D.C. 2002) *vacated in part on other grounds,* 89 F.
App'x 273 (D.C. Cir. 2004)...................................................................................28

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016).....................................................................................18, 21

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).........................................................................................19, 21

*Fla. Key Deer v. Brown*,
386 F. Supp. 2d 1281, 1286 (S.D. Fla. 2005), *aff'd sub nom. Fla. Key Deer v.
Paulison*, 522 F.3d 1133 (11th Cir. 2008). ..........................................................24

*Fla. Key Deer v. Paulison*,
522 F.3d 1133 (11th Cir. 2008) .......................................................................13, 16

*Friends of the Earth v. Laidlaw Envtl. Serv.*,
528 U.S. 167 (2000)...............................................................................................11

*Fund for Animals, Inc. v. Lujan*,
962 F.2d 1391, 1396 (9th Cir. 1992) .....................................................................23

ii

*Fund for Animals v. Espy*,
   814 F. Supp. 142 (D.D.C. 1993) .......................................................24

*Gibbs v. Babbitt*,
   214 F.3d 483 (4th Cir. 2000) ...................................................... *passim*

*Humane Soc'y of the U.S. v. Hodel*,
   840 F.2d 45 (D.C. Cir. 1988) ........................................................23

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986)........................................................................11

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
   681 F.3d 1006 (9th Cir. 2012) .....................................................14

*Lane Cty. Audubon Soc'y v. Jamison*,
   958 F.2d 290 (9th Cir. 1992) ........................................................14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)........................................................................11

*In re Microsoft Corp. Antitrust Litig.*,
   333 F.3d 517 (4th Cir. 2003), *abrogated on other grounds recognized in*
   *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351 (4th
   Cir. 2011) ......................................................................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).....................................................................20, 21

*Nat'l Cable & Telecomm. Assn. v. Brand X Internet Serv.*,
   545 U.S. 967 (2005)........................................................................21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   422 F.3d 782 (9th Cir. 2005) ...................................................10, 28

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) .............................................24, 27, 28

*Nken v. Holder*,
   556 U.S. 418 (2009)........................................................................25

*Omega World Travel, Inc. v. Trans World Airlines*,
   111 F.3d 14 (4th Cir.1997) ............................................................27

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ...........................................................9

Case 2:20-cv-00075-BO   Document 13   Filed 11/19/20   Page 4 of 38

*Red Wolf Coal. v. N. Carolina Wildlife Res. Comm'n,*
    No. 2:13-CV-60-BO, 2014 WL 1922234 (E.D.N.C. May 13, 2014) ....................................26

*Red Wolf Coal. v. U.S. Fish & Wildlife Serv.,*
    210 F. Supp. 3d 796 (E.D.N.C. 2016)................................................................................7, 23

*Red Wolf Coal. v. U.S. Fish & Wildlife Serv.,*
    346 F. Supp. 3d 802 (E.D.N.C. 2018)........................................................................ *passim*

*S.C. Dep't of Wildlife & Marine Res. v. Marsh,*
    866 F.2d 97 (4th Cir. 1989) ....................................................................................................24

*Sierra Club v. Glickman,*
    156 F.3d 606 (5th Cir. 1998) ..................................................................................................16

*Sierra Club v. Morton,*
    405 U.S. 727 (1972)................................................................................................................24

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    645 F.3d 978 (8th Cir. 2011) ..................................................................................................23

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978)..............................................................................................10, 12, 28

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981)................................................................................................................26

*Wash. Cnty., N.C. v. U.S. Dep't of the Navy,*
    317 F. Supp. 2d 626 (E.D.N.C. 2004)......................................................................................9

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982)..........................................................................................................27, 28

*Wetzel v. Edwards,*
    635 F.2d 283 (4th Cir.1980) ..................................................................................................10

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008).................................................................................................................9, 25

**Statutes**

*Administrative Procedure Act*

5 U.S.C. § 553............................................................................................12

5 U.S.C. § 706............................................................................................12

*Endangered Species Act*

16 U.S.C. § 1531(a)(3)................................................................................25

16 U.S.C. § 1532........................................................................................16

16 U.S.C. § 1533(f)......................................................................................4

16 U.S.C. § 1536(a)(1)................................................................................16

16 U.S.C. § 1536(a)(2)................................................................................13

**Regulations**

50 C.F.R. § 17.84(c).....................................................................................3

50 C.F.R. § 402.02......................................................................................14

**Federal Registers**

Determination of Experimental Population Status for an Introduced Population of
  Red Wolves in North Carolina, 51 Fed. Reg. 41,790 (Nov. 19, 1986)................................3, 19

Proposed Determination of Experimental Status for an Introduced Population of
  Red Wolves in North Carolina and Tennessee, 56 Fed. Reg. 37,513 (Aug. 7,
  1991). ..................................................................................................3, 29

Determination of Experimental Population Status for an Introduced Population of
  Red Wolves in North Carolina and Tennessee, 56 Fed. Reg. 56,325 (Nov. 4,
  1991) ..................................................................................................19

Revision of the Special Rule for Nonessential Experimental Populations of Red
  Wolves in North Carolina and Tennessee, 60 Fed. Reg. 18,940 (Apr. 13,
  1995) ................................................................................................4, 20

Proposed Replacement of the Regulations for the Nonessential Experimental
  Population of Red Wolves in Northeastern North Carolina, 83 Fed. Reg.
  30,382 (June 28, 2018)............................................................................ *passim*

Plaintiffs Red Wolf Coalition, Defenders of Wildlife, and Animal Welfare Institute (collectively, "Plaintiffs" or "Conservation Groups") submit this memorandum in support of their Motion for Preliminary Injunction. Plaintiffs' requested injunction is necessary to stop the actions of Defendants U.S. Fish and Wildlife Service ("USFWS" or "the Service"), Aurelia Skipwith, and Leopoldo Miranda (collectively, "Defendants") that are jeopardizing the continued existence of the seven remaining wild red wolves left in the world. Defendants have adopted new policies and practices against releasing red wolves from captivity into the wild and implementing adaptive management of coyotes, violating their duties under the Endangered Species Act and Administrative Procedure Act. Without a preliminary injunction, the population of wild red wolves will likely go extinct before Plaintiffs' claims can be resolved.

## STATEMENT OF THE CASE

Only seven known red wolves roam northeastern North Carolina today—a drop of 70% from the 24 known wolves in the wild two years ago when these parties were last before this Court. Even during the two months since the Conservation Groups sent their Notice of Intent to Sue to Defendants, the world's only wild population lost two members, dropping from nine to seven. With no reproduction in the wild for the past two breeding seasons, the wild red wolves may not survive another year under the Service's new prohibition against releasing captive wolves into the wild.

This recent population drop stands in stark contrast to the previously successful red wolf reintroduction program established by the Service in North Carolina in 1986. Over the program's nearly 30-year history, this population grew and flourished—consistently numbering over 100 wolves on the ground in the wild for over a decade—and becoming an endangered species success story and model for carnivore reintroductions. Releases of captive red wolves

into North Carolina were essential to this success, not only at its outset, when the Service released four pairs into the wild, but for the following 27 years, during which the Service regularly released red wolves from captivity into the wild in North Carolina to help grow the population.

In the face of this history and the agency's consistent understanding that it could, and should, release wolves from the captive breeding population into the wild, the agency has now bound itself to a policy actively prohibiting such releases. Inexplicably, the Service claims that this new policy is necessitated by the red wolf rule that has been unchanged since 1995, pointing back to the language accompanying the original 1986 red wolf rule. The Service provides no explanation for this sudden about-face, in violation of the Administrative Procedure Act—and nor could it without admitting that its novel policy against releasing captive wolves into the dwindling wild population is likely to jeopardize the continued existence of the species, and cannot constitute a program to conserve the red wolf, in violation of the Endangered Species Act. Indeed, the Service's own staff overseeing the wild red wolves could not explain this change and how to reconcile it with agency history and practice. In truth, the Service's new policy is both unfounded and conflicts with the Service's 27-year history of regular red wolf releases in order to conserve and recover the red wolf. Additionally, while the Service previously implemented strategic and systematic adaptive management to successfully limit hybridization with coyotes for over 15 years, the agency now claims that such conservation measures are not authorized by current regulations. The Service's current prohibition on the precise actions that successfully grew the red wolf population is now dooming the wild population to imminent extinction.

With only seven known wolves remaining in the wild, and with no reproduction in the wild for the past two breeding seasons, this Court must take immediate action to prevent the

extinction of red wolves in the wild during the pendency of this litigation. Conservation Groups seek a preliminary injunction requiring the Service to take immediate action to release captive red wolves into the Red Wolf Recovery Area. Such measures are supported by the best available science, the Service's past practice and analysis, and the public interest.

## FACTUAL BACKGROUND

The endangered red wolf was successfully reintroduced into the wild in eastern North Carolina in 1987 with the release of four captive-bred wolf pairs at Alligator River National Wildlife Refuge. *See* Determination of Experimental Population Status for an Introduced Population of Red Wolves in North Carolina, 51 Fed. Reg. 41,790 (Nov. 19, 1986); Proposed Determination of Experimental Status for an Introduced Population of Red Wolves in North Carolina and Tennessee, 56 Fed. Reg. 37,513, 37,514 (Aug. 7, 1991). The range of the reintroduced red wolf population, commonly referred to as the Red Wolf Recovery Area, is defined by regulation to include all of Dare County and the adjacent Tyrrell, Hyde, Washington, and Beaufort Counties. *See* 50 C.F.R. § 17.84(c)(9)(i). The red wolf 10(j) rule and its subsequent revisions define the prohibitions that apply to the wild population of red wolves and were crafted to aid in the conservation of the species. *See* 51 Fed. Reg. at 41,797; 50 C.F.R. § 17.84(c); *see also Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (upholding the red wolf rule as "part of the overall federal scheme to protect, preserve, and rehabilitate endangered species, thereby conserving valuable wildlife resources important to the welfare of our country")

A combination Recovery/Species Survival Plan ("Recovery/SSP Plan") for the red wolf, finalized in 1990, established a goal of 220 red wolves in the wild, as well as 330 wolves in captivity to support that wild population. *See* Declaration of Kim Wheeler ("Wheeler Decl."), Ex. 1, Att. A at 48 (1990 Recovery/SSP Plan). While Recovery Plans are required for all listed

species, 16 U.S.C. § 1533(f), Species Survival Plans are prepared for experimental populations that also include a significant captive component.  *See* Declaration of Margaret Wilhelm ("Wilhelm Decl."), Ex. 2 ¶ 6.  Releasing captive red wolves to establish and maintain a wild population was integral to the Recovery/SSP Plan, and the Plan listed a specific objective of providing at least 12 animals every other year for reintroduction purposes for the first five years of the program.  Wheeler Decl., Ex. 1, Att. A at 53 (1990 Recovery/SSP Plan); *see also id.* at 3 ("The primary long-range goal of the Red Wolf Recovery Program has always been to reintroduce this extinct-in-the-wild species into portions of its historic range."); *id.* at 25 ("It must be emphasized that the purpose of the captive population is to reinforce, not replace, wild populations.").

In the first five-year experimental phase of the red wolf recovery program, from September 14, 1987 through September 30, 1992, the Service released 42 wolves, including 19 adults, 1 yearling, and 22 pups, into the Red Wolf Recovery Area on 15 occasions.  *See* Revision of the Special Rule for Nonessential Experimental Populations of Red Wolves in North Carolina and Tennessee, 60 Fed. Reg. 18,940, 18,940-41 (Apr. 13, 1995) (discussing history of Alligator River reintroduction project).  After considering the results from the five-year experimental reintroduction and public input, the Service determined that it would "maintain the present populations [sic] at Alligator River" and "expand[] this population with reintroductions at Pocosin Lakes [National Wildlife Refuge]."  *Id*. at 18,941.  In doing so, the agency found:

> Increasing the size of the wolf population minimizes threats to its survival.  The primary factor limiting population size is the size of the reintroduction area.  A larger reintroduction area would provide habitat for dispersing wolves and *provide the Service with opportunities to release additional wolves.*

*Id*. at 18,941 (emphasis added).

4

From the start of red wolf releases in September 1987 until the Service's most recent captive red wolf release in April 2014, the Service released red wolves on an annual basis. *See* Wheeler Decl., Ex. 1, Att. I at Tbl. 1 (USFWS Responses in Support of Settlement Agreement).[1] A total of 134 red wolves were released into the five-county Red Wolf Recovery Area, including 42 adults, 22 juveniles, and 70 pups. *See* Declaration of Ben Prater ("Prater Decl."), Ex. 3, Att. G at 3 (2015 Biological Opinion). Ninety of these were captive-born red wolves, forty were born on island propagation sites, and four were transferred from the Great Smokey Mountains National Park reintroduction site. *Id.* Red wolves were released as breeding pairs, sibling groups, family groups, or foster pups. *Id.*

In 1999, the Service recognized hybridization with coyotes as the leading threat to red wolves. *See* Wheeler Decl., Ex. 1, Att. D at 4 (*Population and Habitat Viability Assessment Workshop for the Red Wolf* (Canis rufus) (1999)). The Service accordingly developed its Red Wolf Adaptive Management Work Plan to address the threat of hybridization and began sterilizing coyotes in the Red Wolf Recovery Area pursuant to the Plan in 2000. *See* Wheeler Decl., Ex. 1, Att. C (Red Wolf Adaptive Management Work Plans 2005-2013). Sterilized "placeholder" coyotes do not interbreed with wild red wolves, and they exclude other coyotes or hybrids from the territory they hold. *See, e.g., id.*, Att. B at 10-11 (2007 Status Review). The goals of this Plan, which was updated regularly, were to "(1) reduce interbreeding between red wolves and coyotes to a level that does not threaten the long term genetic integrity of the red wolf in the wild while simultaneously (2) building and maintaining the wild red wolf population from the east to west of the NENC recovery area." Wheeler Decl., Ex. 1, Att. C at 4 (Red Wolf

---

[1] The numbers reported by USFWS in this filing do not match the numbers previously reported in the 2015 Biological Opinion, *see* Prater Decl., Ex. 3, Att. G at 3, and 2016 Population Viability Analysis, *see* Prater Decl., Ex. 3, Att. L at 50, but all three documents indicate that red wolves were regularly released from captivity during this time.

Adaptive Management Work Plans 2005-2013). For fifteen years, the Service's implementation of the Red Wolf Adaptive Management Work Plan effectively addressed the threat of hybridization with coyotes by preventing genetic introgression. *See* Declaration of Dr. John Vucetich ("Vucetich Decl."), Ex. 4 ¶ 26; *id.* at Att. C at 7 (Stoskopf et al. 2005) (describing success of adaptive management).

In its 2007 Status Review, the Service formally declared that "efforts to restore, recover and conserve [red wolves] have been remarkably successful," characterizing the wild red wolf population as "restored" with "up to nearly 130" animals. *See* Wheeler Decl., Ex. 1, Att. B at 33-34 (2007 Status Review).

### The Service's Suspension of Recovery Efforts

When the Service was consistently releasing red wolves into the wild and implementing its Red Wolf Adaptive Management Work Plan, the wild red wolf population steadily numbered over 100 wolves. Prater Decl., Ex. 3, Att. L at 14 (2016 Population Viability Analysis) (hereinafter "PVA"). During 2011-2014, for example, the Service released seven wolves from the captive population, *see id.* at 50, and sterilized and radio-collared at least 81 coyotes in the Red Wolf Recovery Area. *See* Wheeler Decl., Ex. 1 ¶ 20 (detailing sterilizations reported by USFWS); *see also id.*, Att. E (Compiled USFWS Quarterly Reports). But beginning in 2014 and without formal review or consultation, the Service ceased releasing red wolves from captivity into the wild, ceased actively attempting to manage the threat from hybridization with coyotes, and began authorizing the killing of non-problem red wolves by private landowners. *See generally Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 813-14 (E.D.N.C. 2018) (hereinafter "*RWC III*") (finding USFWS in violation of Endangered Species Act).

In November 2013, there were an estimated 100 red wolves in the Red Wolf Recovery Area; but that number fell to 50-75 red wolves in 2015, and 45-60 wolves by March 2016. *See*

*Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 804 (E.D.N.C. 2016) (hereinafter "*RWC II*") (granting injunction against USFWS). "Such rapid population decline has been described as a catastrophic indicator that the wild red wolf population is in extreme danger of extinction." *Id.* By June 2018, the wild red wolf population was down to 24 known animals. *See* Proposed Replacement of the Regulations for the Nonessential Experimental Population of Red Wolves in Northeastern North Carolina, 83 Fed. Reg. 30,382, 30,388 (June 28, 2018).

In November 2018, this Court found that Defendants' abandonment of known conservation measures and the resulting decline in the population violated the Endangered Species Act ("ESA"), and accordingly enjoined Defendants from "taking red wolves, either directly or by landowner authorization . . . without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets." *See RWC III*, 346 F. Supp. 3d at 815. The Court also issued declaratory relief, finding that, among other violations, Defendants violated Section 7(a)(l) of the ESA, 16 U.S.C. § 1536(a)(l), by failing to administer the red wolf recovery program in furtherance of the purposes of the ESA, and Defendants violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), by failing to ensure that its current implementation of the red wolf rule was not likely to jeopardize the continued existence of the red wolf. *Id.*

**The Service's New Policy Prohibiting Red Wolf Releases**

For the past 24 months since the Court's ruling, the Service has not released any captive wolves into the wild population and has not resumed its implementation of the Red Wolf Adaptive Management Work Plan. *See* Wheeler Decl., Ex. 1 ¶¶ 17, 19-20; Prater Decl., Ex. 3 ¶¶ 25-26; *see also* Wheeler Decl., Ex. 1, Att. M (2019 Governor Cooper letter to USFWS asking the Service to resume these measures). To the contrary, the Service now claims that the red wolf 10(j) rule "limit[s] the number of red wolves that can be released on the landscape" and does not

"explicitly incorporate Red Wolf Adaptive Management Work Plan [] activities." 83 Fed. Reg. at 30,384-85.

These claims first appeared publicly in the preamble to the Service's June 2018 proposed revision to the red wolf rule, published during the pendency of the prior litigation. *Id.* There, the Service stated that the current rule did not permit additional releases of red wolves beyond the first 12 wolves that had been released in 1987. *Id.* at 30,385. The Service did not cite to any language in the 1995 rule revision, or any other source, as the basis for this assertion, nor did it acknowledge the previous 134 wolves that had been released in the Red Wolf Recovery Area since 1987, or attempt to reconcile this claim with the 1990 SSP/Recovery Plan. *Id.*; Prater Decl., Ex. 3, Att. G at 3 (2015 Biological Opinion) (release history); Wheeler Decl., Ex. 1, Att. A at 53 (providing for the release of 12 wolves every other year for the first 5 years). Since June 2018, the Service has abided by this policy and repeatedly asserted that it is not permitted to release captive red wolves into the Red Wolf Recovery Area. *See* Prater Decl., Ex. 3 ¶¶ 24, 29-30; *id.*, Atts. H, I (Decision Memoranda); Wheeler Decl., Ex. 1 ¶¶ 12, 16-17.

In internal agency communications discussing the transfer of a wolf from St. Vincent National Wildlife Refuge to Alligator River National Wildlife Refuge in the winter of 2019-2020, USFWS Raleigh Field Supervisor Pete Benjamin stated:

> I toyed with the idea of trying to explain why we can move wolves from St. Vincent, but not the SSP [captive population], but I can't do it. The strongest rationale is that paragraph c(5)(iv) of the 1995 rule states that we can "move an animal for genetic purposes", and unlike the other take provisions in the rule this paragraph does not specifically limit the authorized take to the NEP [Recovery] area. So, when considering this paragraph in light of the overall structure of the rule and the phrasing of the other paragraphs authorizing take, I'd say that this paragraph provides the authority to move animals from St. Vincent to ARNWR for genetic purposes. Of course, it also provides the authority for us to move an animal anywhere for genetic purposes. So, I decided to just let it go.

Prater Decl., Ex. 3, Att. C at 3 (Aug. 6, 2019 email from Pete Benjamin).

Now, only seven known red wolves remain in the wild—a 70% decrease from only 2 years ago. *See, e.g.*, Prater Decl., Ex. 3 ¶ 23; Wheeler Decl., Ex. 1, Att. G (October 2020 Call Notes). The Service has sterilized only eight coyotes in total during that time, and has not reinstated adaptive management or implemented any program to control coyote hybridization. *See* Wheeler Decl., Ex. 1 , Att. L (USFWS Supplemental Responses from Aug. 7, 2020 Hearing). In 2019, for the first time in the history of the North Carolina reintroduction, no wild red wolf pairs bred and no wild red wolf pups were born. *See* Wheeler Decl., Ex. 1, Att. H (USFWS January 2020 Call Notes). Again in 2020, no red wolf pairs bred or produced litters. *See* Wheeler Decl., Ex. 1, Att. F (July 2020 Call Notes); Vucetich Decl., Ex. 4 ¶ 19 ("The absence of any breeding pairs is very disturbing and indicates that something is very wrong with how the wild population is being managed, perhaps having been allowed to become too small to facilitate pair-bonding.").

## STANDARD OF REVIEW

Generally, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013).

The purpose of a preliminary injunction is ordinarily to "preserve the status quo until the rights of the parties can be fairly and fully investigated and determined by strictly legal proof and according to the principles of equity." *Wash. Cnty., N.C. v. U.S. Dep't of the Navy*, 317 F. Supp. 2d 626, 631 (E.D.N.C. 2004) (citation omitted). The Fourth Circuit has determined that a mandatory preliminary injunction is proper where relief is "necessary both to protect against irreparable harm *in a deteriorating circumstance created by the defendant* and to preserve the

court's ability to enter ultimate relief on the merits of the same kind." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) (emphasis added), *abrogation on other grounds recognized in Bethesda Softworks, LLC v. Interplay Entm't Corp.,* 452 F. App'x 351, 353-54 (4th Cir. 2011); *see also Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir.1980) (finding mandatory preliminary injunctions proper "in those circumstances when the exigencies of the situation demand such relief").

In applying the standard for a preliminary injunction, the Court should be mindful that Congress has clearly spoken "in favor of affording endangered species the highest of priorities." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 249 (D.D.C. 2003) (quoting *Tenn. Valley Auth. v. Hill* ("*TVA*"), 437 U.S. 153, 194 (1978)). The "incalculable" harm from the loss of an endangered species and the "overwhelming need to devote whatever effort and resources [are] necessary to avoid further diminution of national and worldwide wildlife resources" tips heavily in favor of protecting endangered species when considering the balance of harms and the public interest. *Id.* at 261 (quoting *TVA*, 437 U.S. at 177); *see also*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 796 (9th Cir. 2005) (hereinafter "*NWF v. NMFS I*") (upholding affirmative relief directing the National Marine Fisheries Service to provide water spill over specified dams to prevent irreparable harm to juvenile chinook salmon).

## **ARGUMENT**

Plaintiffs seek a preliminary injunction to require the Service to release red wolves from the captive population into the Red Wolf Recovery Area to ensure that the wild red wolf population does not continue its march toward extinction during the pendency of this litigation. With only seven known animals currently in the wild, and no reproduction for the past two years, the loss of the wild population is imminent. *See* Vucetich Decl., Ex. 4 ¶ 36 ("We are about to

lose the red wolf population in the wild.").  Indeed, the current population level is a fraction of what it was two years ago, the last time the Parties were before this Court.  *See RWC III,* 346 F. Supp. 3d at 805 (estimated population as low as 40 wolves in April 2018).  This Court should prevent the extinction of the red wolf in the wild by requiring USFWS to temporarily resume the release of red wolves from the captive breeding program *specifically designed for that purpose*, which it successfully undertook for 27 years, and which the agency itself has admitted is essential to the conservation of the species.  Plaintiffs meet the standard for a preliminary injunction given their likelihood of success on the merits of their claims that the Service is violating the ESA and the Administrative Procedure Act ("APA"), the irreparable harm they will suffer if the red wolf continues on its catastrophic decline, and the strong public interest in protecting the red wolf from the Service causing its imminent extinction in the wild.  As stated in the attached declaration from Dr. John Vucetich, "Actions need to be taken right now to save the wild red wolf population."  Vucetich Decl., Ex. 4 ¶ 32.  *See also id*. ¶ 23 ("Bolstering the abundance in the immediate, near-term is key to helping the population persist in the short-term as well as getting the population to where it can have reproducing breeding pairs in the long-term.").[2]

---

[2] Plaintiffs, who have members who regularly look for, observe, study, and appreciate red wolves in the wild, and whose ability to engage in these activities is compromised by the Service's harm to red wolves, have standing to bring this suit.  *See generally* Wheeler Decl., Ex. 1; Prater Decl., Ex. 3; Beeland Decl., Ex. 5; Hancock Decl., Ex. 6; MacAllister Decl., Ex. 7; Wilcox Decl., Ex. 8; *see also Friends of the Earth v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.") (citations omitted); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, n. 4 (1986) (finding that plaintiffs who engaged in "whale watching and studying" had standing to challenge activity that killed whales).

# I. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

The ESA embodies Congress's "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost" and is considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA*, 437 U.S. at 180, 184. The Fourth Circuit has declared that the "overall federal scheme [of the ESA is] to protect, preserve, and rehabilitate endangered species, thereby conserving valuable wildlife resources important to the welfare of our country." *Gibbs*, 214 F.3d at 492. Specifically noting the red wolf's experimental status, the Fourth Circuit stated that "it would be perverse indeed if a species nearing extinction were found to be beyond Congress's power to protect" it. *Id.* at 498.

As explained below, Plaintiffs are likely to succeed on the merits of their claims that the Service is violating ESA Sections 7(a)(1) and 7(a)(2), 16 U.S.C. §§ 1536(a)(1) and (a)(2), by failing to use its authorities to carry out a program for the conservation of the red wolf and failing to insure that its actions are not likely to jeopardize the continued existence of the red wolf. Indeed, despite this Court's November 2018 determination that the Service violated Sections 7(a)(1) and 7(a)(2) when it halted red wolf releases and coyote sterilizations and failed to replace them with any comparable conservation measures, *see RWC III*, 346 F. Supp. 3d at 815, the Service has gone on to commit further ESA violations over the past two years by binding itself to new policies and practices preventing necessary conservation efforts. Furthermore, Plaintiffs are likely to succeed on the merits of their claim that the Service's new policy prohibiting the release of red wolves from captivity, despite having released 90 wolves directly from the captive population over a span of 27 years, *see* Prater Decl., Ex. 3, Att. G at 3 (2015 Biological Opinion), is arbitrary and capricious under the APA, 5 U.S.C. §§ 553, 706.

**A. The Service Is Violating the Endangered Species Act's Requirements to Ensure That Its Actions Are Not Likely to Jeopardize the Continued Existence of the Red Wolf.**

ESA Section 7(a)(2) imposes a substantive obligation on agencies to insure that any actions they authorize, fund, or carry out are not "likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).  This duty is ongoing, *see, e.g.*, *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1087–88 (9th Cir. 2015) (agency has continuing obligation to fulfill Section 7 duties).  While this duty is most often satisfied by undergoing interagency consultation, 16 U.S.C. § 1536(a)(2), the action agency is ultimately bound by the substantive duty articulated in the statute.  *See, e.g.*, *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1138 (11th Cir. 2008) (describing Section 7(a)(2)'s separate procedural and substantive obligations); *Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1094-95 (E.D. Wash. 2006) ("Section 7(a)(2) of the ESA imposes a substantive duty" that "has been characterized as a 'do-no-harm obligation' on agencies when their own actions could cause harm to an endangered species.").

As discussed above, in June 2018, the Service publicly announced for the first time a new policy claiming that it was barred from releasing wolves from the captive population into the wild in North Carolina.  *See* 83 Fed. Reg. at 30,385.  Although the agency had suspended releases in 2015 while it reviewed the Red Wolf Recovery Program, it never stated that this action was anything other than temporary, nor had it claimed that such action was required by regulations that had been in place since 1986.  *See* Wheeler Decl. Ex. 1,  Att. J (June 2015 Press Release announcing the Service's temporary suspension during the program review, which it expected to complete by the end of 2015); *id.*, Att. K (2015 Dohner memo discussing change to legal interpretation of red wolf rule take provision, but not releases).  Indeed, the Service's announcement of this new policy directly conflicted with 27 years of consistent agency practice

13

of releasing wolves from captivity. *See* Wheeler Decl., Ex. 1, Att. I at Tbl. 1 (USFWS Responses in Support of Settlement Agreement) (table of release history). At the same time, the agency also stated in the 2018 Federal Register notice that it was now interpreting its current rule as not authorizing the successful Red Wolf Adaptive Management Work Plan it had implemented for 15 years. 83 Fed. Reg. at 30,384.

These fundamental shifts in agency policy and practice constitute agency actions under Section 7 of the ESA. *See* 50 C.F.R. § 402.02 (defining "action" to include "all activities or programs of any kind authorized, funded, or carried out . . . by Federal agencies"). Courts have routinely recognized Congress's intention that "action" under the ESA be read broadly. *See, e.g.*, *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 598-99 (9th Cir. 2014) (highlighting Congress's intent that "agency action" have broad meaning under ESA). The Service's policy changes thus trigger the agency's Section 7 duty to insure against jeopardy. *See Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293 (9th Cir. 1992) (holding an agency's self-described "voluntarily created policy statement" to be an action for purposes of Section 7(a)(2)); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (cataloging agency actions triggering Section 7). *See also* Wheeler Decl., Ex. 1, Att., K (2015 Dohner memo discussing the need for ESA and National Environmental Policy Act compliance for other red wolf implementation changes).

Here, the Service unsurprisingly made no effort to comply with its procedural obligations to consult under the ESA as the agency and its commissioned scientists had already found on multiple occasions that its actions would, in fact, jeopardize the continued existence of the species. *See, e.g.,* 83 Fed. Reg. at 30,382 (preamble to the Service's 2018 proposed replacement 10(j) rule, stating that "the release of animals from the captive population into the nonessential

experimental population . . . is vital to maintaining a genetically healthy population"); Prater Decl., Ex. 3, Att. L at 3 (PVA) ("Current conditions, without releases from the SSP or improvements to [] vital rates, will result in extinction of the only remaining wild population of red wolves . . . [in] as soon as 8 years."); *id.*, Att. F at 21 (2018 Draft EA) (under current management "the wild red wolf population would likely continue to decrease and would likely become extirpated within between 8 and 40 years"). Indeed, between the Service's new policy barring releases and the Service's new claim that adaptive management is not allowed by the current regulation, the agency appears to be intentionally abandoning the red wolf in the wild. *See* Vucetich Decl., Ex. 4 ¶ 35 ("The actions and inactions of the Fish and Wildlife Service evidence the agency's abandonment of conservation and recovery of the red wolf and appear consistent with managing the population to extinction.").

Under Section 7(a)(2), the Service must ensure that its actions, and any actions it funds or authorizes, do not jeopardize the continued existence of the red wolf. The Service has failed to do this and is instead actively managing the wild population for extinction. *See, e.g.*, Vucetich Decl., Ex. 4 ¶ 36 ("We are about to lose the red wolf population in the wild and its loss would be a grave setback to red wolf recovery; red wolf recovery in the wild would have to start from scratch.").

**B. <u>The Service Is Violating the Endangered Species Act's Requirements to Carry Out Programs for the Conservation and Recovery of the Red Wolf.</u>**

The Service's failure to reinstate its proven conservation measures of captive red wolf releases and coyote sterilizations, or to undertake any comparable conservation measures to save the wild red wolf population from extinction, also violates Section 7(a)(1) of the ESA.

Section 7(a)(1) of the ESA imposes an affirmative obligation on the Service to "utilize [all] programs in furtherance of the purposes of [the ESA]" and utilize its authorities in

furtherance of the purposes of the ESA "by carrying out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1)*; see Carson-Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 261-62 (9th Cir. 1984) (observing that Section 7(a)(1) "specifically directs that the Secretary 'shall' use programs administered by him to further the conversation purposes of the ESA" and reading Section 7(a)(1) in the context of the entire act to show the ESA mandates that "the Secretary actively seeks to conserve endangered species"); *Sierra Club v. Glickman*, 156 F.3d 606, 615-16 (5th Cir. 1998) (stating Congress imposed a duty on all federal agencies to use all necessary methods to recover listed species). "Conserve," in turn, is defined as "to use . . . all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532.

Applied here, Section 7(a)(1) of the ESA requires the Service to use its authorities to promote red wolf recovery by carrying out programs for the conservation of the species. 16 U.S.C. § 1536(a)(1)*; see RWC III*, 346 F. Supp. 3d at 813-14 (Section 7(a)(1) applies to USFWS management of red wolves). "[W]hile agencies might have discretion in selecting a particular program to conserve . . . they must in fact carry out a program to conserve, and not an 'insignificant' measure that does not, or is not reasonably likely to, conserve endangered or threatened species." *Fla. Key Deer v. Paulison*, 522 F.3d at 1147*; see also Glickman*, 156 F.3d at 617 ("A mission agency's discretion to make the final substantive decision under its program authorities does not mean that the agency has unlimited, unreviewable discretion [under Section 7(a)(1)].").

As this Court found in *RWC III*, the Service is not currently carrying out any program for the conservation of the red wolf, even while the wild red wolf population vanishes before its

eyes. 346 F. Supp. 3d at 814. To the contrary, the Service has now committed to *prohibit* any captive releases, which it knows to be essential to red wolf survival, even in the short term, *see* 83 Fed. Reg. at 30,391 ("evidence indicates that continuing additional releases are necessary to maintain the size and genetic health of the population"), and refuses to implement the Red Wolf Adaptive Management Work Plan that it successfully implemented for fifteen years. *See* Prater Decl., Ex. 3 ¶ 26; Vucetich Decl., Ex. 4 ¶ 27 ("The success of the previous adaptive management program makes me concerned that the agency is choosing not to succeed here and now."); *id.*, Att. B at 10 (Expert Report).

The handful of isolated actions that the Service has taken in the past two years does not amount to a *program* to conserve the red wolf. Pursuant to its new policy against releases from captivity, the Service has not released a single wolf from the captive population into the wild in the past two years. Nevertheless, the Service transferred a single red wolf from St. Vincent National Wildlife Refuge to Alligator River National Wildlife Refuge in early 2020. *See* Wheeler Decl., Ex. 1, Att. H (USFWS January 2020 Call Notes); Prater Decl., Ex. 3 ¶ 30; *see also id.*, Att. C (Aug. 6, 2019 email from Pete Benjamin). When the PVA assessed similar scenarios, it found them insufficient to provide for the persistence of the species in the wild, let alone its conservation and recovery. *See generally*, Prater Decl., Ex. 3, Att. L at 3 (PVA). Furthermore, the Service has only once sterilized coyotes since 2018, when USFWS sterilized eight coyotes trapped on and released onto Alligator River National Wildlife Refuge in February 2020. *See* Wheeler Decl., Ex. 2, Att. L (USFWS Supplemental Responses from Aug. 7, 2020 Hearing) (eight coyotes sterilized in total since 2018); Wheeler Decl., Ex. 1 ¶ 20 (eight coyotes sterilized in February 2020). Again, the 2016 Population Viability Analysis found that

improvements to the wild population's vital rates, such as through reduced hybridization, are essential to counteract the wild population's decline. *See* Prater Decl., Ex. 3, Att. L at 21 (PVA).

By contrast, when the Service was actually implementing the Red Wolf Recovery Program to conserve and recover the red wolf, from 1987-2014, it took a multi-pronged and systematic approach. This program included annual releases of red wolves into the Red Wolf Recovery Area—totaling 134 releases by 2014, *see* Prater Decl., Ex. 3, Att. G at 3 (2015 Biological Opinion)—and adaptive management of coyotes under the Red Wolf Adaptive Management Work Plan. *See* Wheeler Decl., Ex. 1, Att. C (Red Wolf Adaptive Management Work Plans 2005-2013); Vucetich Decl.¶ 26. Pursuant to the Adaptive Management Work Plan, the Service sterilized and radio-collared at least 81 coyotes in 2011-2014 alone. *See* Wheeler Decl., Ex. 1 ¶ 20 (detailing sterilizations reported by USFWS); *see also id.*, Att. E (Compiled USFWS Quarterly Reports).

The Service is violating ESA Section 7(a)(1) by failing to provide for the conservation of the red wolf.

### C. The Service's Policy Prohibiting the Release of Captive Red Wolves Into the Red Wolf Recovery Area Violates the Administrative Procedure Act.

The Service's new policy barring captive releases of red wolves into the Red Wolf Recovery Area, under which the Service claims it was limited to releasing no more than 12 wolves into the wild, is arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (holding that "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice") (citations omitted). This new policy departs from the Service's past practice with no supporting rationale or recognition of this change. *See id.* at 2125-26. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Id.* at 2125.

However, an agency may not "depart from a prior policy *sub silentio*." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the Service has done just that.

The Service claims:

> [T]he current regulations limit the number of red wolves that can be released on the landscape. The release of up to 12 wolves was explicitly authorized in the 1986 regulations (51 FR 41790; November 19, 1986). No additional releases were authorized during subsequent rule revisions in 1991 (56 FR 56325; November 4, 1991) and 1995 (60 FR 18940; April 13, 1995).

83 Fed. Reg. at 30,385.

But the text of the red wolf rule lacks any such limit as the Service now claims. *See* 51 Fed. Reg. at 41,792. The only reference to 12 wolves is instead found in the *preamble* to the 1986 rule, yet even that does not say what the Service now claims. There, the Service stated that "[a] reintroduction project at the [Alligator River National Wildlife Refuge] requires the removal of 8 to 12 animals from the captive population over a period of 12 months." *Id*. The Service concluded this discussion in its 1986 preamble by stating that "the Service has carefully evaluated the numerical status of this species and has determined that the taking of 8 to 12 animals from this captive assemblage would pose no threat to the survival of the species, even if all of these animals succumb to natural or man-caused factors." *Id.* at 41,795.

Thus, neither the text of the rule nor the preamble set any regulatory limit—instead the preamble's language was a statement that the release of this number of wolves would cause no concerns to the captive population. Subsequent to 1986, moreover, the Service proceeded with the understanding that there was no limit on its ability to release whatever number of wolves was necessary to recover the species. *See, e.g.*, Determination of Experimental Population Status for an Introduced Population of Red Wolves in North Carolina and Tennessee, 56 Fed. Reg. 56,325, 56,327 (Nov. 4, 1991) ("[T]he goal of the Service's red wolf recovery program has continued to be the eventual release of at least some of the captive animals into the wild to establish

populations within the species' historic range."); Prater Decl., Ex. 3 , Att. G at 3 (2015

Biological Opinion) (134 red wolves released between 1987-2014). For example, the Service

released 42 wolves into the Red Wolf Recovery Area over the first five years of the Red Wolf

Recovery Program, and explicitly acknowledged this in its 1995 revision to the red wolf 10(j)

rule—without ever mentioning any alleged "limit" on its ability to release wolves. *See* 60 Fed.

Reg. at 18,940 ("From September 14, 1987, through September 30, 1992, 42 wolves (adults— 10

males, 9 females; yearlings—1 female; pups—12 males, 10 females) were initially released on

15 occasions."); *see also Gibbs v. Babbitt*, 214 F.3d at 488 (discussing history of releases).

Indeed, after the initial five-year reintroduction experiment at Alligator River National

Wildlife Refuge concluded on October 1, 1992, *see* 60 Fed. Reg. at 18,940, the Service openly

declared that it would continue to release more red wolves from captivity, and that it was

permitted to do so on refuge land across the Red Wolf Recovery Area without any change in the

rule. *See* 60 Fed. Reg. at 18,941 ("The reintroductions at Pocosin Lakes are within counties

previously designated for the experimental population and require no changes in the existing

rule."). This inclusion of Pocosin Lakes National Wildlife Refuge was intended to allow the red

wolf population to increase, and "[i]ncreasing the size of the wolf population minimizes threats

to its survival." *Id.*

This lengthy history of consistent past red wolf releases demonstrates a clear agency

understanding of its authority to release wolves from the captive breeding population into the

wild population for the conservation and recovery of the red wolf. A "settled course of behavior

embodies the agency's informed judgment that, by pursuing that course, it will carry out the

policies committed to it by Congress." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983) (citation omitted). The public, the members of

the red wolf captive breeding program, and the Service itself all understood and relied on red

wolf releases as an integral component of red wolf recovery. *See, e.g.*, Wilhelm Decl., Ex. 2 ¶

22 ("recovering red wolves in the wild is the whole reason the SSP was created"). By contrast,

the Service has now reversed course on this understanding without even acknowledging that it

ever interpreted the red wolf rule differently during its nearly 30 years of consistent agency

practice. The circumstances of this sudden reversal in policy obligate the Service to "provide a

more detailed justification than what would suffice for a new policy created on a blank slate."

*F.C.C. v. Fox*, 556 U.S. at 515. The Service's failure to provide a "reasoned explanation" for

"disregarding facts and circumstances that underlay or were engendered by the prior policy"

further makes this new policy an arbitrary and capricious change from agency practice. *Id.* at

515-16; *Nat'l Cable & Telecomm. Assn. v. Brand X Internet Serv.*, 545 U.S. 967, 981 (2005).

Internal agency documents further demonstrate the arbitrariness of the agency's new

position and reveal that even top agency staff members were at a loss for how to explain the

agency's stance that it may move wolves from the St. Vincent site to the North Carolina

population, but not from the captive population to the North Carolina population under the

current rule. *See* Prater Decl., Ex. 3, Att. C at 3 (Aug. 6, 2019 email from Pete Benjamin).

The conclusory explanation now offered by the Service is illogical, legally incorrect, and

insufficient to meet the agency's burden under the APA to both acknowledge its change in

position and provide a *reasoned* explanation for that change. *See Encino Motorcars*, 136 S. Ct.

at 2125-26; *F.C.C. v. Fox*, 556 U.S. at 515; *State Farm*, 463 U.S. at 41-43. The agency has

not—and indeed cannot—provide any plausible argument to support this change in position.

The Service has acted arbitrarily and capriciously in asserting that it may not legally release red

wolves from the captive population and binding itself to this policy.

## II.    Plaintiffs Are Likely to Suffer Irreparable Harm If an Injunction Is Not Granted.

Defendants' policies and actions have pushed the wild red wolf to the brink of extinction. There are only seven known red wolves in the wild at this time, with annual deaths exceeding reproduction.  *See* Vucetich Decl., Ex. 4 ¶¶ 16, 19.  Absent a preliminary injunction, Conservation Groups and their members are likely to suffer irreparable harm.  In this regard, the Supreme Court has stated that because "[e]nvironmental injury, by its very nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration [it is] irreparable."  *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545 (1987).

Given the incredibly small and swiftly declining population numbers, the interests of Conservation Groups and their members in seeing, hearing, and enjoying these animals in the wild is at imminent risk of irreparable harm.  *See* Prater Decl., Ex. 3 ¶¶ 16-20; Wheeler Decl., Ex. 1 ¶¶ 23-28; Beeland Decl., Ex. 5 ¶¶ 18-20, 23; Hancock Decl., Ex. 6 ¶¶ 14-19; MacAllister Decl., Ex. 7 ¶¶ 4, 8-10; Wilcox Decl., Ex. 8 ¶¶ 5, 11-14.  With a population of only seven wolves in the Red Wolf Recovery Area, the ability of Conservation Groups' members to view, study, or photograph these animals is already incredibly restricted.  *See, e.g.*, Wheeler Decl., Ex. 1 ¶ 25 ("While I used to go looking for wolves every few weeks, it saddens me to know there are no longer as many opportunities to view wolves on Refuge properties in the Recovery Area because of their decline.  If USFWS were to release more wolves into the Recovery Area and help the wild population to increase, I would certainly go out looking for them more frequently."); Wilcox Decl., Ex. 8 ¶ 13 ("It's painful for me to think about a future in which there may be no more wolves left in the Recovery Area for me to ever be able to view and photograph."); Beeland Decl., Ex. 5 ¶ 24 ("However, I worry that if red wolf management continues in its

current state, my children may never be able to view red wolves in the wild."). And with no reproduction in the wild, it is getting more difficult as the Service's mismanagement continues.

The Service's failure to conserve red wolves through its policy prohibiting the release of red wolves from captivity is risking the imminent extirpation of the world's only wild red wolf population and accordingly harms Conservation Groups' recreational and aesthetic interests in observing and enjoying red wolves in the wild. *See, e.g.*, Prater Decl., Ex. 3 ¶¶ 36-40; Hancock Decl. Ex. 6 ¶¶ 21-22 ("I am worried that these policies and actions will prevent me and my family from ever successfully seeing red wolves in the wild."). It is well-established that harm to a plaintiff's aesthetic or recreational interests is a cognizable injury. *See RWC II*, 210 F. Supp. 3d at 805-06 ("Plaintiffs' members have clearly demonstrated that a decrease in their ability to enjoy red wolves in the wild, the possibility of an increase in red wolf mortality, and the decline or extinction of the species would cause them to suffer irreparable harm."). A plaintiff's aesthetic and recreational interests are harmed by actions that impair his or her enjoyment of the environment. *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995-96 (8th Cir. 2011) (finding that construction of a power plant harmed plaintiff by "interfer[ing] with [his] interests in studying and enjoying the environment"). Thus, a plaintiff is harmed by actions that impair his or her ability to enjoy wildlife in its natural environment. *See Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988) (finding harm where action would "deplet[e] the supply of animals and birds that refuge visitors seek to view"); *see also Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1396 (9th Cir. 1992) (finding that "the diminished opportunity of the Fund's members to view the northern bison herd in Yellowstone establishes standing to challenge the 1990 bison management plan").

Harm to a person's aesthetic and recreational interests in enjoying wildlife is irreparable because it cannot be undone. The Supreme Court has emphasized that "[e]nvironmental injury, *by its nature*, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Gambell*, 480 U.S. at 545 (emphasis added); *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (same); *see also Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society."). Environmental injuries are irreparable because they affect interests that "are not ownership interests in property susceptible to monetary valuation." *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993). In essence, for the purpose of a preliminary injunction, the terms "environmental" and "irreparable" are interchangeable modifiers of "harm." *See Fla. Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1286 (S.D. Fla. 2005) ("[I]n determining whether the irreparable injury prong has been satisfied, the Court considers whether environmental harm is likely to occur."), *aff'd sub nom. Fla. Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008).

Conservation Groups' members will suffer irreparable harm to their recreational and aesthetic interests if this Court does not grant injunctive relief. The Service's prohibition on the release of captive wolves into the Red Wolf Recovery Area and refusal to resume adaptive management to reduce hybridization with coyotes harm the health and recovery of the wild red wolf population, which in turn diminishes the ability of Conservation Groups' members to see, hear, study, photograph, and otherwise enjoy red wolves in their natural habitat. *See, e.g.*, Wheeler Decl., Ex. 1 ¶ 25; Prater Decl., Ex. 3 ¶¶ 36-40; Wilcox Decl., Ex. 8 ¶ 18; Beeland Decl., Ex. 5 ¶¶ 24, 27, 30. *See also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803,

819 (9th Cir. 2018) (hereinafter "*NWF v. NMFS II*") ("Showing an extinction-level threat to listed species is not required before an injunction can issue under the ESA.").

If the Service is allowed to continue in its current management and policies, Conservation Groups' members will continue to be harmed by the Service's mismanagement of the wild red wolf population. *See* Vucetich Decl., Ex. 4 ¶ 35 ("The actions and inactions of the Fish and Wildlife Service evidence the agency's abandonment of recovery of the red wolf, and appear consistent with managing the population to extinction."). Conservation Groups' requested preliminary injunction would remedy this harm.

### III.   The Balance of Harms and the Public Interest Justify Granting Injunctive Relief.

A party seeking a preliminary injunction must demonstrate both "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The protection of endangered species is in the public interest because endangered species "are of 'esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people.'" *Gibbs*, 214 F. 3d at 487 (quoting 16 U.S.C. § 1531(a)(3) (1994)). In *Gibbs*, the Fourth Circuit specifically noted that the wild red wolf population creates multiple public benefits, from tourism and opportunities for scientific research to the reduction of animals that harm farming enterprises, such as raccoons, deer, and rabbits. *Gibbs*, 214 F.3d at 493-95. Simply put, conservation of the red wolf is in the best interest of the public because "[i]f we conserve the species, it will be available for the study and benefit of future generations." *Gibbs*, 214 F.3d at 496. Indeed, as this Court previously stated:

> By designating the red wolf as protected and dedicating funding and efforts for
> more than twenty-five years in a program to rehabilitate the once-nearly extinct

species, Congress has repeatedly demonstrated that it has chosen to preserve the
red wolf—not simply to let inaction determine its fate—and it is not for this Court
to permit activities that would have an effect counter to this goal.

*Red Wolf Coal. v. N. Carolina Wildlife Res. Comm'n*, No. 2:13-CV-60-BO, 2014 WL 1922234,

at *8 (E.D.N.C. May 13, 2014) (citing *Gibbs*, 214 F.3d at 496 ("[I]t is for Congress to choose

between inaction and preservation, not for the courts.")).

While the public interest is clearly harmed by the Service's actions causing the ongoing

catastrophic decline of the world's only wild red wolf population, neither the Service nor the

public will be harmed by an injunction requiring that the agency temporarily resume the release

of captive red wolves into the Red Wolf Recovery Area. As noted above, red wolf releases were

undertaken regularly over nearly 27 years and are a fundamental part of ensuring red wolf

recovery in the wild. *See, e.g.*, Prater Decl., Ex. 3, Att. G at 3 (2015 Biological Opinion)

(detailing release history); Wheeler Decl., Ex. 1, Att. I at Tbl. 1 (USFWS Responses in Support

of Settlement Agreement). Moreover, the more than 30-year history of this program has

demonstrated that wolves cause very few problems for private landowners. *See* Prater Decl., Ex.

3, Att. F at 11 (2018 Draft EA) (finding that red wolves caused only 7 depredations in the history

of the program, and most complaints were found to be caused by domestic dogs). And most

importantly, without releases, the wild red wolf population is at imminent risk of extinction. *See*

Vucetich Decl., Ex. 4 ¶ 37 ("Efforts to grow the wild population of red wolves should be enacted

immediately, including resuming releases of captive red wolves into the wild population to help

increase the number of breeding pairs and enhance genetic diversity of the population.").

Conservation Groups' requested relief is necessary to ensure that the wild red wolf still

exists in North Carolina—and the world—when the Court hears the merits of this case. *See*

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (purpose of a preliminary injunction is "to

preserve the relative positions of the parties until a trial on the merits can be held"). At the same

time, as discussed further below, Plaintiffs' requested relief is also narrowly tailored to provide immediate conservation benefit to the species and avert its imminent extinction, while also respecting the historic experience and expertise of the Service in carrying out the needed red wolf releases. *See NWF v. NMFS II*, 886 F.3d at 823-24 (upholding spill operation plan necessary to protect endangered fish developed by court order).

In light of the ESA's conservation mandate, the balance of harms and the public interest demonstrate that Plaintiffs' requested preliminary injunction should be granted.

## IV.    The Court Should Grant Relief Based on USFWS's Own Actions and Studies.

Along with other elements of relief, Conservation Groups have asked this Court to order Defendants to develop a plan to:

> with the advice and consent of the Red Wolf Species Survival Program, resume the release of captive red wolves into the Red Wolf Recovery Area by releasing at least two pairs of captive red wolves, no later than May 31, 2021, AND release at least four additional captive red wolves, or two pairs, before December 31, 2021.

Pls.' Mot. for Prelim. Inj. at 4-5.

This preliminary relief is necessary to protect Conservation Groups and their members from suffering further harm as a result of Defendants' actions during the pendency of this litigation, and to preserve this Court's ability to render a meaningful judgment on the merits. *See, e.g.*, *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir.1997) (noting purpose of preliminary relief to protect movant against harm from the illegality alleged). As stated by the Supreme Court, "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945).

Courts generally retain broad discretion to issue equitable relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 310 (1982). Under the ESA, "the purpose and language of the statute"

reflect Congress's intent to insure against the likelihood of jeopardy to listed species. *Id*. at 314-15 (discussing *TVA*, 437 U.S. at 173); *Defs. of Wildlife v. Norton*, 239 F.Supp. 2d 9, 23 (D.D.C. 2002) ("Defendants fail to cite any language in the legislative history of the ESA to suggest that Congress intended to limit courts' authority to remedy the Service's violation of its nondiscretionary duties"), *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004). For example, in *NWF v. NMFS I*, the Court found that the district court's grant of injunctive relief was justified to prevent ongoing harm to listed salmon. 422 F.3d at 796. "One of the primary complications of this case is that the operations in question are by necessity, ongoing." *Id*. Thus, simply delaying a destructive action was not possible, and the court was required to either continue an ongoing violation of the ESA or make modifications that would cure the violation. *Id*. at 796-97. Accordingly, the court relied on expert opinion and agency history to promulgate an appropriate remedy. *Id.*

The Court in this case should do the same. USFWS conducted red wolf releases for 27 years and extensively documented both its methodology for the releases, as well as what it learned from them, providing this Court with ample guidance for issuing the requested remedy. A 2003 review of red wolf releases from 1987-1994, authored by Red Wolf Recovery Program staff, detailed the variety of methods that can be used in releasing red wolves into the wild, highlighting that most releases involved pairs or family groups. *See* Prater Decl., Ex. 3, Att. J at 6 (Phillips et al. 2003). The review concluded with a list of key points, including the effectiveness of holding captive wolves in acclimation enclosures, the importance of "numerous releases over an extended period of time," and how captive-born wolves "serve as the catalyst for population formation," and "were appropriate 'seed stock' for restoring a free-ranging population." *Id*. at 17. The Service's 2015 Biological Opinion, which evaluated the resumption

of captive releases into the Red Wolf Recovery Area, noted that over the years, red wolves have been released in a variety of familial configurations—as pairs, siblings, family groups, and foster pups—and again detailed how releases can be completed after an appropriate acclimation period. *See* Prater Decl., Ex. 3, Att. G, at 3-4.

Moreover, Service experience and the best available science support the annual release of eight wolves per year—the same number of adult wolves released in 1987 at the inception of the red wolf reintroduction, *see* 56 Fed. Reg. at 37,514, and the same number of releases allowed in a single year under the 2015 Biological Opinion, *see* Prater Decl., Ex. 3, Att. G at 17 (stating the number of allowed releases should "not . . . exceed 8 wolves in any single year"); *see also id.*, Att. L at 50 (PVA) (listing several years when 8 or more wolves were released from captivity into the wild); *id.*, Att. J at 6 (Phillips et al. 2003) (documenting the release of 63 wolves from 1987-1994, an average of nine wolves per year).

These actions are necessary and appropriate to protect the wild red wolf population from the imminent likelihood of extinction. *See* Vucetich Decl., Ex. 4 ¶ 23 ("Until the population is larger, closer to 30-45 wolves, a great premium must be placed on safely releasing wolves from the captive population into the wild and as rapidly as possible and until a more comfortable population number is reached."). Quoting the Fourth Circuit in *Gibbs*:

> Extinction, after all, is irreversible. If a species becomes extinct, we are left to speculate forever on what we might have learned or what we may have realized. If we conserve the species, it will be available for the study and benefit of future generations. In any event, it is for Congress to choose between inaction and preservation, not for the courts.

214 F.3d at 496.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant this Motion for Preliminary Injunction.

29

Respectfully submitted, this the 19th day of November, 2020.

/s/ Ramona H. McGee
Ramona H. McGee
N.C. State Bar No. 47935
rmcgee@selcnc.org
Sierra B. Weaver
N.C. State Bar No. 28340
sweaver@selcnc.org
Derb S. Carter, Jr.
N.C. State Bar No. 10644
derbc@selcnc.org

SOUTHERN ENVIRONMENTAL LAW CENTER
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2020, I electronically filed the foregoing

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** with

the Clerk of the Court using the CM/ECF system.

I hereby certify that I have mailed the document to the following non-CM/ECF

participants via certified mail:

Aurelia Skipwith, Director
U.S. Fish & Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240

U.S. Fish & Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240

Leopoldo Miranda, Regional Director
Southeast Region
U.S. Fish & Wildlife Service
1875 Century Boulevard, N.E Suite 400
Atlanta, GA 30345

Civil Process Clerk
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530

William P. Barr, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

I hereby certify that I have caused the United States Attorney for the Eastern District of

North Carolina to be served via hand delivery at the following address:

Office of the United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601

Respectfully Submitted,

/s/ Ramona H. McGee
Ramona H. McGee
N.C. State Bar No. 47935
rmcgee@selcnc.org

SOUTHERN ENVIRONMENTAL LAW CENTER
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

Attorney for Plaintiffs