IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:20-CV-75-BO

RED WOLF COALITION, DEFENDERS )
OF WILDLIFE, and ANIMAL WELFARE )
INSTITUTE, )
  )
        Plaintiffs, )
  )
v. )          O R D E R
  )
THE UNITED STATES FISH AND )
WILDLIFE SERVICE; AURELIA )
SKIPWITH, in her official capacity as )
Director of the United States Fish and )
Wildlife Service; LEOPOLDO MIRANDA, )
in his official capacity as Regional Director )
of the United States Fish and Wildlife )
Service Southeast Region, )
  )
        Defendants. )

This cause comes before the Court on plaintiffs' motion for preliminary injunction

pursuant to Rule 65 of the Federal Rules of Civil Procedure. Defendants have responded,

plaintiffs have replied, and a hearing on the matter was held before the undersigned on January 7,

2021, by videoconference at Elizabeth City, North Carolina. In this posture, the matter is ripe for

ruling and, for the reasons that follow, plaintiffs' motion is granted.

BACKGROUND

A.      Procedural background

Plaintiffs initiated this action by filing a complaint on November 16, 2020, alleging that

the defendants have violated Section 7(a)(2) of the Endangered Species Act by failing to ensure

that its actions are not likely to jeopardize the continued existence of the red wolf, violated

Section 7(a)(1) of the Endangered Species Act by failing to carry out a program for the

conservation of the red wolf, and violated the Administrative Procedures Act by irrationally and without explanation reversing its policy on the release of captive red wolves into the Red Wolf Recovery Area. The instant motion was filed on November 19, 2020.

B.      Factual background[1]

The Court provides a summary of the relevant background provided in plaintiffs' complaint and attachments to their motion for preliminary injunction.

The red wolf was once common in the southeastern United States, but its numbers dwindled to near extinction due to hunting and other human pressures. [DE 13-1] Wheeler Decl. Attach. A; 51 Fed. Reg. 41,791. In 1987, four pairs of captive-bred red wolves were released in the Alligator River National Refuge as a nonessential, experimental population under Rule 10(j) of the Endangered Species Act. 16 U.S.C. § 1539(j). The Red Wolf Recovery Area now encompasses five northeastern North Carolina counties: Dare, Tyrell, Hyde, Washington, and Beaufort. 50 C.F.R. § 17.84(c)(9)(i).

A 1990 Recovery/Species Survival Plan (SSP) published by the U.S. Fish and Wildlife Service (USFWS) established program goals of 220 red wolves in the wild and 330 red wolves in captivity. Wheeler Decl. Attach. A at 54 of 116. Other specific objectives of the SSP included maintaining a stable, self-sustaining population of red wolves in both captivity and the wild and providing at least twelve red wolves every other year for reintroduction to the wild over the next five years. *Id.* at 57-59 of 116. As of a 2007 five-year status review, wild red wolf population counts fluctuated between approximately 100 and 130 in the five county area. Wheeler Decl. Attach. B. ¶ 2.3.1.d.

---

[1] The history of the red wolf species and the Red Wolf Recovery Program has been recited in several prior orders. *See, Red Wolf Coal. v. United States Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 808 (E.D.N.C. 2018); *Gibbs v. Babbitt*, 31 F. Supp. 2d 531, 532 (E.D.N.C. 1998), *aff'd,* 214 F.3d 483 (4th Cir. 2000).

USFWS released captive red wolves into the wild every year between 1987 and 2014. Wheeler Decl. Attach I. In addition to increasing the captive red wolf population and supporting the wild population through releases, USFWS also employed other active management strategies. For example, having recognized in its SSP that interactions with coyotes would need to be monitored, Wheeler Decl. Attach. A at 59 of 116, USFWS began in 1999 to sterilize coyotes located in the Red Wolf Recovery Area to reduce hybridization with red wolves. *See* Wheeler Decl. Attach. D.

On June 30, 2015, USFWS[2] announced that it would cease releasing red wolves from captivity into the wild while it reviewed the continued viability of the Red Wolf Recovery Program. [DE 1] Compl. ¶ 70. USFWS also began authorizing lethal takes[3] of non-problem red wolves by private landowners and ceased actively managing coyote hybridization by sterilizing coyotes. In 2016, these plaintiffs came to this Court challenging USFWS' actions and seeking preliminary injunctive relief to prevent additional lethal take authorizations of red wolves who did not present a threat to the safety of humans, livestock, or pets. *Red Wolf Coal. v. United States Fish & Wildlife Serv. (Red Wolf Coal. I)*, 210 F. Supp. 3d 796, 807-08 (E.D.N.C. 2016).

This Court preliminarily enjoined USFWS from authorizing lethal takes of non-problem red wolves, *id.*, and subsequently entered permanent declaratory and injunctive relief against USFWS. *Red Wolf Coal. (Red Wolf Coal. II) v. United States Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 815 (E.D.N.C. 2018). Specifically, the Court permanently enjoined USFWS from authorizing lethal takes of non-problem red wolves either directly or by landowner authorization. It further held that USFWS had, *inter alia*, "violated Section 7(a)(1) of the [Endangered Species Act], 16 U.S.C. § 1536(a)(1), by failing to administer the red wolf recovery program in

---

[2] The Court uses "USFWS" and "defendants" interchangeably in this order.
[3] "Take" is defined by the Endangered Species Act as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage of any such conduct." 16 U.S.C. § 1532(19).

3

furtherance of the purposes of the ESA" and "violated Section 7(a)(2) of the [Endangered Species Act], 16 U.S.C. § 1536(a)(2), by failing to ensure that implementation of 50 C.F.R. § 17.84(c), in light of new information and modifications to the application of the red wolf rule, is not likely to jeopardize the continued existence of the red wolf." *Red Wolf Coal. II*, 346 F. Supp. 3d at 815.

When the plaintiffs came to this Court in 2016, the wild red wolf population had dropped to between forty-five and sixty wolves. *Red Wolf Coal. I*, 210 F. Supp. 3d at 799. When the Court entered permanent injunctive and declaratory relief in 2018, their numbers had dropped to forty. *Red Wolf Coal. II*, 346 F. Supp. 3d at 805. At the time plaintiffs filed their complaint in this case, they allege that there are only seven known red wolves currently in the wild. Compl. ¶ 2.

Plaintiffs allege that USFWS has since June 2018 repeatedly asserted that it is not permitted to release captive red wolves into the Red Wolf Recovery Area. *Id.* ¶ 81. In the winter of 2019-20, USFWS did release one red wolf into the Red Wolf Recovery Area, which it transferred from the wild population of six red wolves located in St. Vincent National Wildlife Refuge in Florida. *Id.* ¶ 82; [DE 13-27] Prater Decl. Attach. H. Plaintiffs further allege that defendants have sterilized only eight coyotes in the Red Wolf Recovery area since 2018, and all were sterilized in February 2020. *Id.* ¶ 89. This is in contrast to seventy-five coyotes having been sterilized in the Red Wolf Recovery Area between January 2012 and March 2014. *Id.* ¶ 90. In essence, plaintiffs allege that defendants have essentially ceased all active management practices aimed at supporting the red wolf population in the wild, and the result has led to near extinction of the wild population of red wolves.

4

DISCUSSION

I.    Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553

U.S. 674, 689 (2008) (quotation and citation omitted). A movant must make a clear showing of

each of four elements before a preliminary injunction may issue: (1) that he is likely to succeed

on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief,

(3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama,*

*Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009).

Typically, a preliminary injunction is entered in order to preserve the status quo ante.

*Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) (citation omitted). Mandatory preliminary

injunctions, on the other hand, "do not preserve the status quo and normally should be granted

only in those circumstances when the exigencies of the situation demand such relief." *Id.*

II.    Analysis

A. Likelihood of success on the merits

Plaintiffs have demonstrated that they are likely to succeed on the merits of their

Endangered Species Act claims. Section 7 of the Act provides that

> (1) The Secretary [of the Interior] shall review other programs administered by
> him and utilize such programs in furtherance of the purposes of this chapter. All
> other Federal agencies shall, in consultation with and with the assistance of the
> Secretary, utilize their authorities in furtherance of the purposes of this chapter by
> carrying out programs for the conservation of endangered species and threatened
> species listed pursuant to section 1533 of this title.
> (2) Each Federal agency shall, in consultation with and with the assistance of the
> Secretary, insure that any action authorized, funded, or carried out by such agency
> (hereinafter in this section referred to as an "agency action") is not likely to
> jeopardize the continued existence of any endangered species or threatened
> species or result in the destruction or adverse modification of habitat of such
> species which is determined by the Secretary, after consultation as appropriate

5

with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(1)-(2). Both sections referenced above impose affirmative, substantive duties on the Secretary and the agencies, such as USFWS, to which the Secretary has delegated his duties. *See Sierra Club v. Glickman*, 156 F.3d 606, 615-16 (5th Cir. 1998); *Defs. of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1095 (E.D. Wash. 2006). In other words, in regard to the affirmative duty to carry out a program to conserve a species,

> while agencies might have discretion in selecting a particular program to conserve . . . they must in fact carry out a program to conserve, and not an "insignificant" measure that does not, or is not reasonably likely to, conserve endangered or threatened species. To hold otherwise would turn the modest command of section 7(a)(1) into no command at all by allowing agencies to satisfy their obligations with what amounts to total inaction.

*Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir. 2008). Section 7(a)(2) imposes a duty to consult whenever federal action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of" as used in Section 7(a)(2)).

USFWS argues that plaintiffs' Endangered Species Act claims will fail. Defendants contend that the Court lacks jurisdiction to consider these claims because Section 7(a)(1) gives USFWS and other agencies broad discretion in determining how to factor endangered species conservation into their decision making, and the failure to act does not constitute agency action which requires consultation under Section 7(a)(2). Defendants' arguments miss the mark.

At the outset, the Court agrees with plaintiffs that defendants' vague challenge to this Court's jurisdiction lacks merit as plaintiffs' claims have plainly been brought under the citizen-suit provision of the Endangered Species Act. *See* Compl. ¶ 6.

6

Though inaction has been held not to trigger a duty to consult under Section 7(a)(2), *see W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1107-08 (9th Cir. 2006), plaintiffs challenge USFWS's *action* of adopting a binding policy which dictates that it lacks the authority to release captive red wolves into the wild in the Red Wolf Recovery Area. Moreover, plaintiffs' challenge to defendants' policy is substantive, not procedural as defendants argue.

As to plaintiffs' Section 7(a)(1) claim, defendants argue that this section of the statute is inapplicable to them. This argument is unsupported by the case law and has been previously rejected by this Court. *See Red Wolf Coal. II*, 346 F. Supp. 3d at 813 (citing *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp.2d 553, 567 (D. Vt. 2005)). Plaintiffs correctly argue that defendants indeed have discretion in implementing programs for Section 7(a)(1) purposes, but that such programs *must be for the conservation of endangered and threatened species*. Defendants current list of actions, included in the declaration of defendant Miranda-Castro, fails to show how they are implementing a program for the conservation of the wild red wolf population. Regional Director Miranda-Castro details how USFWS has recently committed to revise its red wolf recovery plan by February 2023 as well as the steps USFWS will take and issues it will consider in revising that plan. [DE 17-1] Miranda-Castro Decl. ¶ 2. He details the steps USFWS has taken to involve state partners and key stakeholders in its on-going review of the program, including points of agreement that have been reached among members of a team comprised of representatives from federal and state agencies, university scientists, species experts, non-governmental organizations, and private landowners. *Id.* ¶ 8-9.

Regional Director Miranda-Castro also discusses the USFWS's current active management of the wild red wolf population: monitoring any radio-collared wolves; using remote sensing cameras and scent stations to assess red wolf movements, pack dynamics, and

general wolf health; as well as working toward collaring all red wolves with bright orange collars. *Id.* ¶ 14. These passive management techniques appear to fall woefully short of a program designed to conserve the red wolf in the wild. As this Court previously held,

> It is undisputed that the reintroduction of the red wolf into the Red Wolf Recovery Area is not without its challenges, but absent a change in Congress' mandate or a decision to delist or reclassify the red wolf under the [Endangered Species Act], the recent USFWS decisions to discontinue successful population management tools while increasing the likelihood that landowner lethal takes will be approved for wolves which historically would not have been subject to take, amount to a failure comply with its affirmative duty to "carry out conservation measures until conservation [is] no longer necessary."

*Red Wolf Coal. II*, 346 F. Supp. 3d at 814 (E.D.N.C. 2018) (citation omitted). That USFWS is no longer authorizing lethal takes for non-problem wolves does not change the conclusion that a policy to discontinue successful population management tools likely violates Section 7 of the Endangered Species Act.

Finally, plaintiffs have demonstrated a likelihood of success on their Administrative Procedures Act claim. Defendants contend that this claim fails because plaintiffs have not challenged a final agency action. But plaintiffs' allegations and evidence support that the policy to discontinue releasing captive red wolves into the wild population in the Red Wolf Recovery Area represents a consummation of USFWS's decision making process, and is not tentative or interlocutory. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Despite having released captive red wolves into the wild consistently from the inception of the program through 2015, in 2018 USFWS declared that it was limited to releasing up to twelve wolves and that no additional releases after that were actually authorized. 83 Fed. Reg. at 30,385.

USFWS argues that this statement represents a "pause" in one aspect of its red wolf management program, and thus is interlocutory and not final or binding. But this argument is in direct conflict with USFWS's own preliminary statement to its June 2018 Proposed Replacement

of the Regulations for the Nonessential Experimental Population of Red Wolves in Northeastern North Carolina. *Id*. It is true that the June 2018 proposed rule has not been adopted and is not a final rule, but this same policy position is also reflected in internal agency documents, including a June 2019 decision memorandum for the regional director. [DE 13-27] Prater Dec. Attach. H ("Based upon the current interpretation of the existing 10(j) rule for the management of the NENC [wild population], the Service is not authorized to directly release animals from the Species Survival Plan (SSP) captive population into the NENC [wild population].").

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Defendants have not pointed to a reasoned explanation for their change in policy, and "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* (internal alteration, quotations, and citation omitted). The Court thus concludes that plaintiffs are likely to succeed on their Administrative Procedures Act claim.

B. Irreparable harm

Plaintiffs allege irreparable harm to their members if there are no red wolves in the wild to enjoy viewing, hearing, and photographing. *See, e.g.,* Wheeler Decl. ¶ 25; [DE 13-42] Beeland Decl. ¶¶ 18-20; [DE 13-47] Hancock Decl. ¶¶ 14-19; *see also Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 995 (8th Cir. 2011) (harm to plaintiffs' aesthetic, educational, and ecological interests in the environment sufficient to demonstrate irreparable harm). Defendants do not expressly argue that plaintiffs' members will not be irreparably harmed, but rather list the steps they are taking to address long-term recovery planning.

9

While the risk of extinction is certainly not required to obtain injunctive relief, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018), plaintiffs have demonstrated that extinction is a very real possibility in this case. Roughly half of the seven remaining wild red wolves are aged nine or ten years, leaving them with short remaining life expectancy; there were no breeding pairs and no red wolf pups born in the wild in 2019 or 2020, indicating that the wild population may have become too small to facilitate breeding pairs; and reversal of the prior policy to release captive red wolves into the wild population and engage in proactive and regular adaptive management to address coyote hybridization have had significant adverse impacts and will hasten the extinction of red wolves in the wild. [DE 13-34] Vucetich Decl. ¶¶ 16-20. The Court determines that plaintiffs have demonstrated irreparable harm.

C. Balance of equities and the public interest

The parties agree this these factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants argue that the balance of the equities and the public interest weigh against granting preliminary injunctive relief, again citing the work it is doing to draft and finalize a revised plan to recover the red wolf. Defendants' argument again misses the mark. Plaintiffs are not alleging that USFWS should cease its efforts to revise its red wolf recovery plan, rather they are arguing that USFWS violates the Endangered Species Act and the Administrative Procedures Act when it takes actions while doing so which all but guarantee the extinction of the wild population of red wolves in the Red Wolf Recovery Area.

It has been plain since the Fourth Circuit's decision in *Gibbs v. Babbitt* that conservation of the wild red wolf is in the public interest. 214 F.3d 483, 496 (4th Cir. 2000) ("it is for Congress to choose between inaction and preservation . . ..") To date, Congress has not chosen to abandon efforts to rehabilitate red wolves in the wild. In light of the particular harm threatened in

this case, plaintiffs have further demonstrated that additional relief, beyond merely maintaining the status quo, is necessary in this instance to "protect against irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). The extinction of the wild red wolf during the pendency of this litigation would indeed hinder this Court's ability to render any meaningful judgment, and the exigency of the extinction of the wild red wolf population in the Red Wolf Recovery Area demands such relief.

Accordingly, the Court determines that plaintiffs have satisfied their burden and that entry of a preliminary injunction is appropriate.

III.    Injunction

A. Scope and terms

At the hearing before the undersigned, defendants detailed some recent actions which inform this Court's decision as to the scope and terms of its preliminary injunction. Defendants have obtained a permit from the State of North Carolina which will allow them to sterilize coyotes on private and state lands in addition to federal lands. Defendants indicated that they currently are attempting to make two pairs of red wolves ready to release into the Red Wolf Recovery Area. All parties were able to agree that releasing family groups and pup fostering are two of the most effective ways to release red wolves and increase their chance of survival in the wild. The parties further agree that the release of red wolves unprepared to live in the wild fails to further conservation.

The Court has determined that defendants' current policy which interprets the red wolf 10(j) rule as preventing them from releasing red wolves from the captive population into the Red Wolf Recovery Area likely violates the Endangered Species Act and the Administrative

11

Procedure Act. Failing to release additional wolves, from either the captive population or wild population at St. Vincent National Wildlife Refuge, will all but certainly result in the extinction of the red wolf in the wild in North Carolina. Preliminarily enjoining defendants from effecting its policy regarding captive red wolf releases is necessary to prevent this outcome.

However, the Court will not mandate a particular number of wolves to be released or a timeline for the release of captive wolves into the Red Wolf Recovery Area as plaintiffs request. Rather, defendants shall draft a plan to release captive red wolves into the Red Wolf Recovery Area in consultation with their scientists and experts in the field. This plan will be submitted to the Court not later than March 1, 2021, and plaintiffs will be permitted fourteen days to respond. Defendants' release plan should include metrics which can be used to measure performance so that the parties may return to the Court in six months with a joint status update. In the absence of any objection by the plaintiffs, USFWS shall act under the terms of its release plan without requiring further order from the Court.

B. Security

Rule 65(c) of the Federal Rules of Civil Procedure requires the Court to consider whether plaintiffs should provide security in an amount sufficient to pay the costs and damages sustained by any party found to have been wrongfully enjoined. Where circumstances warrant it, a nominal bond may suffice. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

The Court finds such circumstance to exist here where plaintiffs are public interest groups who might otherwise be barred from obtaining meaningful judicial review were the bond required more than nominal. *See Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971). Accordingly, the Court finds that a $100 security will be sufficient.

## CONCLUSION

Accordingly, for the foregoing reasons, plaintiffs' motion for preliminary injunction [DE 12] is GRANTED.

Defendants are PRELIMINARILY ENJOINED from implementing their policy barring the release of captive red wolves into the Red Wolf Recovery Area. Defendants shall draft a plan to release captive red wolves into the Red Wolf Recovery Area in consultation with their scientists and experts in the field to be submitted to the Court not later than March 1, 2021. Plaintiffs are permitted fourteen days to respond. In the absence of any objection by the plaintiffs, defendants shall act under the terms of its release plan without requiring further order from the Court.

The Court will hold a status hearing in six months.

Plaintiffs shall provide a $100 security to the Court not later than January 29, 2021.

SO ORDERED, this **21** day of January, 2021.

Terrence W. Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE